IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 19, 2021 Session

## STATE OF TENNESSEE v. ERIC TYRE PATTON

**Appeal from the Circuit Court for Rutherford County**
No. 79062    Royce Taylor, Judge
———————————————————

### No. M2020-00062-CCA-R3-CD
———————————————————

The Appellant, Eric Tyre Patton, was convicted in the Rutherford County Circuit Court of conspiracy to sell 150 grams or more of heroin and 300 grams or more of cocaine with at least one overt act occurring within a drug-free school zone (DFSZ) and possession of 300 grams or more of cocaine with intent to sell or deliver within a DFSZ.  On appeal, the Appellant contends that the evidence is insufficient to support the convictions; that the trial court erred by denying his motion to suppress evidence obtained from GPS tracking devices and wiretaps; that the trial court erred by not requiring the State to identify four confidential informants (CIs); that the trial court erred by admitting testimony about a prior bad act and by denying his motion for a mistrial; that the trial court improperly instructed the jury on witness credibility; that the State improperly withheld exculpatory information in violation of Brady v. Maryland, 373 U.S. 83 (1963); and that he is entitled to relief under cumulative error.  Based upon the oral arguments, the record, and the parties' briefs, we find no reversible error and affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

Drew Justice (on appeal and at trial), Murfreesboro, Tennessee; Thomas T. Overton and Brent Horst (at trial), Nashville, Tennessee; and Linda Sue Nicklos (at trial), La Vergne, Tennessee, for the appellant, Eric Tyre Patton.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; Jennings H. Jones, District Attorney General; and John C. Zimmerman and Clyde Eric Farmer, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## I. Factual Background

In June 2015, the Rutherford County Grand Jury returned a sixty-three-count indictment, charging the Appellant and twenty-one codefendants with various drug- and weapons-related offenses. Subsequently, the grand jury returned a superseding four-count indictment, charging the Appellant alone as follows: count one, conspiracy to sell 150 grams or more of heroin and 300 grams or more of cocaine with at least one overt act occurring within a DFSZ; count two, possession of 300 grams or more of cocaine with intent to sell or deliver within a DFSZ; count three, possession of a firearm with intent to go armed during the commission of or the attempt to commit the dangerous felony alleged in count one and the Appellant previously had been convicted of a dangerous offense; and count four, possession of a firearm with intent to go armed during the commission of or the attempt to commit the dangerous felony alleged in count two and the Appellant previously had been convicted of a dangerous offense.[1] Count one of the indictment alleged that the conspiracy to possess heroin and cocaine occurred between January 1, 2014, and February 28, 2015, and listed eight overt acts to support the conspiracy. Count two alleged that the possession of cocaine occurred on November 22, 2014.

At trial, Special Agent Bryan Noel of the Tennessee Bureau of Investigation (TBI) Narcotics Division testified that in July 2014, the TBI and the Rutherford County Sheriff's Office (RCSO) began investigating heroin drug deals that were occurring in Murfreesboro and Smyrna. The investigation led to Wayne LeBlanc, who was selling heroin, and Agent Noel began trying to determine LeBlanc's "supplier." On September 9, 2014, Agent Noel learned from communications between the case agent and a confidential informant (CI) that LeBlanc was going to meet with his supplier. Officers began surveilling LeBlanc, followed him to a McDonalds restaurant at the corner of St. Andrews Drive and Old Fort Parkway in Murfreesboro, and saw him get into a red Ford Excursion. Officers could not see into the Excursion because it had tinted windows. However, after the meeting, officers followed the Excursion to a tire shop on South Church Street and saw the Appellant get out of the vehicle and go inside the business. Agent Noel later learned that the Appellant was a co-owner of the tire shop. The TBI installed a remote-controlled camera on a nearby telephone pole and began watching the shop.

Agent Noel testified that as the investigation continued, the TBI learned that Jamarr Kuilan was conducting eight to ten heroin deals per day and "was doing deliveries all over the city all day long pretty much every day." On October 27, 2014, Agent Noel obtained

---

[1] Before the State read the indictment to the jury at trial, the trial court advised the parties that the trial would be bifurcated so that the jury would not know in counts three and four that the Appellant had a prior conviction.

a wiretap for Kuilan's cellular telephone. Within a few days, Agent Noel had intercepted drug-related calls between Kuilan and the Appellant. On November 5, 2014, Agent Noel obtained a wiretap for the Appellant's cellular telephone. From that wiretap, Agent Noel heard calls about a backpack. On November 22, 2014, officers knew "something was going on with the backpack" and that the backpack was going to be picked up at the apartment of Crystal Hill, who was one of the Appellant's girlfriends. Agents began watching Hill's apartment on Old Fort Parkway and the Appellant's tire shop.

Agent Noel testified that officers saw Mike Simpson, who worked for the Appellant, leave the tire shop in the Appellant's Excursion and drive to Hill's apartment. Simpson put a large backpack into the Excursion and drove the Excursion back to the tire shop. A maroon Pontiac that was owned by the Appellant's long-time girlfriend, Laura Mintlow, arrived in the tire shop's parking lot, and a man later identified as Cecil Chapman got out of the Pontiac and talked with Simpson. Chapman and Simpson then transferred the backpack from the Excursion to the trunk of the Pontiac. Chapman got back into the Pontiac, and the Pontiac left the parking lot. Agent Noel identified photographs showing Simpson and Chapman transferring the backpack from the Excursion to the Pontiac, and the State introduced the photographs into evidence.

Agent Noel testified that police officers followed the Pontiac and eventually stopped the car "on the pretense of a traffic stop." The officers "ended up getting consent to search the car," found the backpack in the trunk, and brought the backpack to Agent Noel. Agent Noel searched the backpack and found a stolen handgun; "about a kilo and a half cocaine"; several ounces of "Molly," which Agent Noel described as a "club drug"; and marijuana.

On cross-examination, Agent Noel testified that when Wayne LeBlanc met with the Appellant on September 9, officers did not see LeBlanc obtain heroin from the Appellant. Agent Noel said that during the investigation, officers used CIs to purchase forty to forty-five grams of heroin and that the TBI used those heroin buys as the basis for obtaining the wiretaps. One of the wiretaps was for a cellular telephone that was registered to Laura Mintlow. However, Agent Noel was able to the determine that the telephone actually belonged to the Appellant. Agent Noel said that he did not meet with the Appellant in person until January 2015 and acknowledged that he could not say for certain that the voice he heard on the wiretaps was the Appellant's voice. Moreover, the people on the wiretaps did not identify themselves. After the police obtained the backpack from the Pontiac, Agent Noel heard a wiretap conversation in which the Appellant discussed the backpack. Although the police had found the backpack, the Appellant sounded calm. Agent Noel acknowledged that a former police officer who worked on this case, Lieutenant Jason Mathis, was being criminally investigated for "some sort of misconduct within [Mathis's] capacity as a narcotics detective."

Detective Mark Gregory of the RCSO testified that about 4:00 p.m. on November 22, 2014, he stopped a maroon Pontiac on Interstate 24 for failure to maintain its lane of travel. Cecil Chapman was the driver, and Mr. Chapman's wife, Latrisha Chapman, was the passenger. Detective Gregory asked Mr. Chapman for consent to search the Pontiac, and Mr. Chapman gave consent. Detective Gregory opened the trunk and saw a large backpack. He opened the backpack and immediately saw marijuana. Detective Gregory stopped searching the backpack, detained the Chapmans, and searched them to make sure they did not have any weapons or contraband on their persons.

Detective Gregory testified that after he searched the Chapmans, he resumed searching the backpack. He said the backpack contained the following items: a bag of marijuana weighing 148 grams; a bag of crack cocaine weighing 113 grams; a bag of Molly weighing 67 grams; a rectangle brick of cocaine weighing 588 grams; a square brick of cocaine weighing 634 grams; a digital scale; a Glock 17 nine-millimeter semi-automatic pistol and ammunition; a Sentry safe containing bags used to prepackage drugs for resale, a set of headphones, a High Cap gun magazine, and drug ledgers; a box of sandwich bags; a box of latex gloves; two cellular telephones; a lunch box with some loose bags; and a pair of male gym shorts. Detective Gregory said he was sure he found all of those items in the backpack.

Detective Gregory testified that he "ran a NCIC history" on the pistol and that the gun had been reported stolen in Shelbyville. Another officer found a black wallet in the center console of the Pontiac, and the wallet contained several credit cards belonging to the Appellant. Detective Gregory found $2,066 in Mr. Chapman's front pocket and a wallet in Mr. Chapman's back pocket. Detective Gregory identified his "dash cam video" of the traffic stop. The State did not play the video for the jury but introduced the video into evidence.

On cross-examination, Detective Gregory identified a copy of his police report. He acknowledged that according to his report, he found the marijuana in the backpack and found the other items in the Pontiac.

Latrisha Chapman testified that she was the Appellant's cousin and that she was charged as a codefendant in this case with conspiracy to distribute cocaine and possession of cocaine with intent to sell. Mrs. Chapman pled guilty to reduced charges and received an eight-year sentence to be served in prison. As part of her plea agreement, she signed an affidavit explaining what she knew about this case and was required to testify truthfully against the Appellant. Mrs. Chapman spent almost three years in confinement but was on parole at the time of the Appellant's trial.

Mrs. Chapman testified that on November 22, 2014, her husband told her that the Appellant wanted them to pick up a backpack. The Chapmans drove to the Appellant's tire shop and obtained the backpack from Mike Simpson. When Mrs. Chapman saw the backpack, she suspected that it contained drugs. The police later stopped the Chapmans on the interstate and said they "needed to search the car." The police found the backpack in the trunk, and the police arrested the Chapmans.

Mrs. Chapman testified that prior to her arrest, she suspected that the Appellant was storing drugs in her home because the Appellant would arrive at her residence with an empty backpack but would leave with something in the backpack. She said that the Appellant was not making a lot of money at his tire shop but that he owned several cars, remodeled his girlfriend's house, and paid $10,000 for a food trailer. Mrs. Chapman said that she did not use or sell drugs and that she had never been in trouble prior to her arrest on November 22. On cross-examination, Mrs. Chapman testified that she "found out" the Appellant was storing drugs in her home and that she "looked the other way." She acknowledged that by cooperating with law enforcement, she avoided serving a sentence of fifteen to twenty years in prison.

Kenton Kramer testified that he was the Administrator of Franklin Road Christian School, an agency-approved private school in Murfreesboro. In 2014, "just under 400" students were enrolled in the school, which served students in preschool through twelfth grade. Kamiah Malid testified that she was the Principal of Islamic Center of Murfreesboro (ICM) Academy. In 2014, ICM Academy was certified by the Tennessee Association of Church Related Schools and served three- and four-year-olds. Malid acknowledged that the school was a primary school, which was "like a preschool." At the time of trial, ICM Academy served children two years old through second grade.

Michael Curtis testified that he was the GIS Manager for Rutherford County. At the request of the district attorney's office, Curtis prepared a map of Franklin Road Christian School on Old Fort Parkway and a map of ICM Academy on South Church Street. Curtis created a 1,000-foot buffer zone around each school. Crystal Hill's apartment was within the buffer zone for Franklin Road Christian School, and the Appellant's tire shop was within the buffer zone for ICM Academy.

Crystal Hill testified that she was charged as a codefendant in this case with conspiracy to distribute cocaine. Hill pled guilty and received an eight-year sentence. She spent almost seven months in jail, was released upon her guilty plea, and was placed on probation. As part of her plea agreement, she signed an affidavit explaining what she knew about this case and was required to testify truthfully against the Appellant.

Hill testified that in November 2014, she and her children were living in an apartment on Old Fort Parkway. Hill was dating the Appellant, and he spent every night at her apartment. On November 22, Mike Simpson came to Hill's apartment and "retrieved" a backpack from a closet where the Appellant kept his belongings. Hill said that the backpack contained "a lock box" and that the backpack was "extremely heavy." Hill said that she never put anything into the backpack but that she saw drugs in the backpack. She never saw the Appellant with drugs, but he would have visitors at her apartment. Hill also heard the Appellant tell Mike Simpson to make deliveries to the Mapco across the street from her apartment, and Simpson would return from the deliveries with money for the Appellant. Hill later learned the Appellant was a drug supplier.

Hill testified that in January 2015, she had not seen the Appellant in a couple of weeks. The Appellant "popped up" and asked Hill to rent him a car. Hill and the Appellant went to Enterprise Rent-A-Car, and Hill ended up renting two cars for the Appellant. Hill identified a receipt, showing that she rented two cars on January 9, 2015, and that the Appellant was named as the additional driver. The Appellant told Hill that he missed her and that he wanted her to go with him on a road trip to Ohio. Hill said that she went on the trip with the Appellant and that they ended up in Saginaw, Michigan, with Kimberly Jordan; Juan Kuilan, who was Jamarr Kuilan's father; and two other people.[2] During the trip, Hill saw a powdery substance that she thought was heroin and realized the Appellant had gone to Michigan to buy drugs.

Hill testified that the Appellant told her to give some of the drugs to Jordan "to hold or whatever." On the drive back to Tennessee, the Appellant and Hill were riding in one rental car, and Jordan and Kuilan were riding in the other rental car. When Hill and the Appellant arrived in Murfreesboro, they learned that the police had stopped the second rental car. Hill said the Appellant told her that he had been selling drugs since he was a teenager and that he was "very good at it." The Appellant also told her that he was planning to stop selling drugs "after he achieved his final goal."

On cross-examination, Hill testified that she was in love with the Appellant when she learned about his involvement with drugs. She said that she was not a drug dealer but that she was charged with conspiracy "because I rented him a car" and "because my house was supposedly a safe house." Hill was pregnant at the time of her arrest, and she spent 207 days in jail. The State offered her a plea deal in exchange for her testimony against the Appellant, and she accepted the offer because she did not want to be separated from her baby when it was born. She acknowledged that prior to her guilty plea, she had been facing a twenty-five-year sentence to be served at one hundred percent.

---

[2] Because Juan and Jamarr Kuilan share a surname, we may refer to them by their first names for clarity.

Wayne LeBlanc testified that he was charged as a codefendant in this case and that he pled guilty to several charges in exchange for a ten-year sentence. He spent three years in confinement and was on parole at the time of the Appellant's trial.

Mr. LeBlanc testified that he began doing construction work for the Appellant and that the Appellant paid him in cash. Eventually, the Appellant told Mr. LeBlanc that he did not have any cash and asked if he could pay Mr. LeBlanc with heroin and cocaine. Mr. LeBlanc thought he could "either go home broke or go home with drugs," so he accepted the drugs. He said that he "ended up" using both of the drugs but that he resold some of the heroin at a gas station across the street from his residence.

Mr. LeBlanc identified wiretap conversations he had with the Appellant. In one of the conversations, Mr. LeBlanc told the Appellant that the heroin "wasn't strong enough" and that no one wanted to buy it. At some point, Mr. LeBlanc began "fronting" heroin for the Appellant, meaning that Mr. LeBlanc paid the Appellant for the heroin after Mr. LeBlanc sold it. Mr. LeBlanc sold heroin for the Appellant for about three months, and he obtained the heroin from the Appellant at the Appellant's tire shop or at Crystal Hill's apartment. Mr. LeBlanc and his wife later discovered that GPS tracking devices were on their cars, so they went to Massachusetts. The police arrested them in Boston. When the LeBlancs were released from jail, they returned to Tennessee and voluntarily turned themselves in to law enforcement.

On cross-examination, Mr. LeBlanc testified that he had been facing a twenty-year sentence prior to his guilty plea. As part of his plea agreement, he had to testify against the Appellant. He acknowledged that if he did not testify as the prosecutor wanted him to testify, he could be charged with perjury and end up back in prison.

Christina LeBlanc, Wayne LeBlanc's wife, testified that she and her husband moved to Smyrna, Tennessee, in 2012. Mrs. LeBlanc had a graduate degree in Human Resource Management and eventually became the Director of Resource Management for Wilson County. Mr. LeBlanc did construction work. Mr. LeBlanc began doing construction work for the Appellant, and the Appellant started paying him with drugs. Mr. LeBlanc obtained the drugs at the Appellant's house or at the Appellant's tire shop, and Mrs. LeBlanc thought the Appellant was storing the drugs at the shop.

Mrs. LeBlanc testified that the Appellant began to think the tire shop was being watched, so he moved the drugs from the shop to Juan Kuilan's residence. In June 2014, the drugs were moved to the LeBlanc residence. Mrs. LeBlanc said that she was addicted to heroin and that the Appellant would give her and Mr. LeBlanc small amounts of heroin "as a thank you payment" for keeping the drugs in their home.

Mrs. LeBlanc testified that the Appellant would come to her home a couple of times per week to "cut the product and prepare it for sale." At some point, the amount of heroin available decreased, so the Appellant began adding lactose to the heroin to increase the quantity. However, the lactose decreased the quality of the drug, and Mr. LeBlanc complained to the Appellant. The Appellant kept the heroin in a safe that was about the size of a manila folder. Mrs. LeBlanc said the safe was "full" of heroin, and the Appellant told her that the value of the heroin was about $80,000. At some point, Mr. and Mrs. LeBlanc began selling heroin for Juan Kuilan. Kuilan told Mrs. LeBlanc that he was selling a quarter of a kilogram of heroin every few days. One time, Mrs. LeBlanc drove Kuilan in the Appellant's red SUV to pick up heroin.

Mrs. LeBlanc testified that she and Mr. LeBlanc sold heroin for the Appellant for a couple of months. She said they would buy one-tenth of a gram from the Appellant for $20 and sell it for $30, and she estimated that they sold a total of twenty-five grams of heroin. In November 2014, the LeBlancs discovered GPS tracking devices on their cars and abruptly left Tennessee. In June 2015, charges were filed against them. The LeBlancs were arrested in Massachusetts, posted bond, and returned to Tennessee to turn themselves in to the police. Mrs. LeBlanc pled guilty, received a ten-year sentence, and was released from prison in November 2017. At the time of the Appellant's trial, she was on parole.

On cross-examination, Mrs. LeBlanc testified that she was charged with conspiracy to sell drugs in a DFSZ. Prior to her guilty plea, she had been facing a sentence of fifteen to twenty-five years to be served at one hundred percent. She pled guilty to several charges, received an effective ten-year sentence, and served two and one-half years in confinement. Her plea agreement required that she testify against the Appellant.

Kimberly Jordan testified that she was charged as a codefendant in this case. In 2014, Jordan met the Appellant through her boyfriend, Juan Kuilan. Kuilan was involved in selling drugs, and the Appellant brought heroin to Jordan's apartment at least three or four times so that Kuilan could resell it. Kuilan would package the heroin in the bathroom and resell it to customers who came to Jordan's apartment. The LeBlancs came to the apartment to buy drugs and to obtain drugs for resale.

Jordan testified that she and Juan Kuilan "ended up going to Michigan" with the Appellant and Crystal Hill to purchase drugs. Before they left Michigan, the Appellant gave Jordan a baggie of what appeared to be heroin, and Jordan "stashed" the heroin for the Appellant. On the way back to Tennessee, the Tennessee Highway Patrol (THP) stopped Kuilan's and Jordan's rental car. Jordan saw a "shack," asked to use the restroom, and "flushed" the heroin she had been hiding for the Appellant. At some point, Jordan was arrested and spent six and one-half months in jail. She pled guilty to "conspiracy" and

received an eight-year sentence to be served on probation. As part of her plea agreement, she had to testify truthfully against the Appellant.

On cross-examination, Jordan testified that prior to her guilty plea, she was facing a fifteen- to twenty-five-year sentence. She acknowledged that she deceived the THP by asking to use the restroom and disposing of the heroin.

The State recalled Agent Noel to the stand. Agent Noel testified that in January 2015, the TBI heard wiretaps about the Appellant's using Crystal Hill's credit card to rent cars. The TBI realized that a "trip was about to take place" and obtained authorization to place a GPS tracking device on one of the rental cars. The TBI then "surveilled them on their way out of town" and back to Tennessee. Law enforcement monitored the tracking device to Detroit. When the cars returned to Tennessee, the THP stopped the car that did not have the tracking device so that law enforcement could continue to monitor the car that had the device. The THP did not find any drugs during the stop, but Agent Noel later learned that Kimberly Jordan had "flushed" some drugs.

Agent Noel testified that the TBI continued to monitor wiretap calls and that "it sound[ed] like they [were] about to take whatever they got in Michigan and cut it to step on it and . . . to mix it up." Based on those calls, the TBI decided to obtain and execute search warrants on numerous residences. The TBI executed two search warrants in Nashville: one at the Appellant's mother's house, where "they were mixing the drugs," and one at an apartment on Brick Church Pike, where Vickie Brown's brother lived. Vickie Brown was another girlfriend of the Appellant. The TBI also executed twelve or fourteen search warrants in Rutherford County, including the residence of Juan Kuilan and Kimberly Jordan and the residence of Jamarr Kuilan and Lakeisha Smith. Agent Noel said that the TBI "partnered" with at least six other agencies so that law enforcement could execute the warrants at the same time.

Lieutenant James Goney of the RCSO testified that he helped execute the search warrant at the Appellant's mother's home. During the search, an officer found a plastic baggie in a bathroom toilet. The baggie contained a brown substance that field-tested positive for heroin. The heroine weighed eleven grams. Officers also found a recently-washed Ninja blender in the kitchen. The Appellant's Ford Excursion was parked at the home, and Lieutenant Goney drove the vehicle back to Rutherford County. He executed a search warrant on the Excursion and found "paperwork" for the Appellant's tire shop in the vehicle.

On cross-examination, Lieutenant Goney testified that when the police first entered the Appellant's mother's home, about fifteen people, mostly children, were "[s]cattered all throughout the house." However, the Appellant was not present. Lieutenant Goney

acknowledged that Jason Mathis was his "acting" lieutenant at the time of the search and that the TBI was criminally investigating Mathis at the time of the Appellant's trial.

Detective Dennis Ward of the RCSO testified that he helped execute the search warrant at the apartment of Juan Kuilan and Kimberly Jordan. During the search, officers found a bag containing what appeared to be heroin, digital scales, plastic baggies, a Sentry safe, a bag of old cellular telephones, miscellaneous documents, three boxes of nine-millimeter ammunition that were appropriate for a Glock 17 firearm, additional cellular telephones, and "a couple other small amounts of heroin." Officers also executed search warrants on vehicles at the residence and found a blender in one of the vehicles. On cross-examination, Detective Ward acknowledged that Lieutenant Mathis participated in the search of the apartment. According to an evidence log introduced as an exhibit, Lieutenant Mathis found several items during the search, including an ounce of heroin in a red shoe.

The State called Agent Noel to the stand for a third time, and he identified wiretap conversations between the Appellant and various people. The calls were played for the jury. During a call on November 6, 2014, someone mentioned "China." Detective Noel told the jury that he thought "China" was a reference to a type of heroin known as "China White." Someone on the recording also mentioned "80 for the whole and 40 for the half." Agent Noel said that the speaker could have been referring to $80,000 for a kilogram of heroin and $40,000 for one-half kilogram, which were the appropriate prices for China White at that time. On November 14, 2014, the Appellant had a conversation with an unidentified person. During the conversation, they talked about "glass" and "a truck full of wood," which Agent Noel said could have been references to narcotics. They also talked about Molly and "a whole brick of soft," which could have been a reference to one kilogram of powder cocaine. Agent Noel noted that officers seized Molly and a kilogram of cocaine during the stop of the Chapmans on November 22. On November 15, 2014, the Appellant had a conversation with Kenneth "Coach" Oreo, who the TBI believed was supplying the Appellant with cocaine. On the morning of November 22, 2014, the Appellant had a conversation with Jamarr Kuilan in which they discussed "soft," which was a reference to powder cocaine.

On cross-examination, Agent Noel acknowledged that during the call on November 14, the Appellant told the person with whom he was speaking that he was not interested "in doing whatever they [were] talking about." Agent Noel also acknowledged that during the Appellant's conversation with Jamarr Kuilan on the morning of November 22, they did not discuss a drug transaction. Instead, the Appellant and Kuilan discussed "amounts that were owed."

Lieutenant Will Holton with the RCSO testified that in 2014, he was a taskforce officer with the Drug Enforcement Division and had "a small role" in the investigation of

the Appellant. On January 14, 2015, Lieutenant Holton executed a search warrant at an apartment on Brick Church Pike. Vickie Brown answered the door, and the Appellant was in the bedroom. Lieutenant Holton thought the apartment had only one bedroom. During the search of the apartment, officers found a man's tan jacket hanging in the bedroom closet. A bag of heroin and forty-eight hydromorphone tablets were in a pocket of the jacket, and dry cleaning in the Appellant's name was hanging near the jacket. A black mink jacket also was hanging in the bedroom closet, and the mink jacket had been dry cleaned in the Appellant's name. Money, a digital scale, and a set of keys were in a pocket of the mink jacket.

Lieutenant Holton testified that officers also found a second bag of heroin in the apartment. The total weight of both bags of heroin was six grams. In the living room, officers found a digital scale with a brown residue on it, a grinder commonly used to grind marijuana, a small bag of marijuana, and a small bag of cocaine. Officers searched the Appellant's person and found that he had a "wad" of money in his pants pocket that totaled about $2,000. Officers found the Appellant's driver's license in the apartment, and the license showed that the Appellant's height was six feet, four inches. Lieutenant Holton noted that the size of the tan jacket in the closet was "5XL." He read Miranda warnings to the Appellant and asked if the Appellant lived in the apartment. The Appellant said no and that "he had just stayed there the night before." The Appellant also told Lieutenant Holton that his red Excursion was at his mother's house.

On cross-examination, Lieutenant Holton testified that the Appellant claimed the apartment was the residence of Brown's brother. Lieutenant Holton said that he did not know how long the Appellant had been staying in the apartment but that "I do know however he had been living there long enough for us to obtain a search warrant for the residence." Lieutenant Holton could not remember if officers found the Appellant's driver's license in the tan jacket or on a nightstand in the bedroom.

Ella Carpenter, a Special Agent Forensic Scientist for the TBI, testified as an expert in forensic science that she analyzed a "brick" that was found in the backpack. The brick was cocaine and weighed 541.11 grams. Agent Carpenter did not analyze a second brick because the weight of the first brick exceeded 300 grams. However, the second brick was made of a substance that was "visually consistent" with the first brick. A plant material in the backpack was marijuana and weighed 131.06 grams.

Brandi Fisher of the TBI testified as an expert in forensic science that she analyzed a tan rock-like substance that was found in the Appellant's mother's home. The substance was heroin and weighed 6.42 grams. Laura Cole, a Special Agent Forensic Scientist for the TBI, testified as an expert in forensic science that she analyzed two bags of tan powder that were found in the apartment of Juan Kuilan and Kimberly Jordan. The tan powder

was heroin. The heroin in the first bag weighed 23.62 grams, and the heroin in the second bag weighed 0.91 grams. Agent Cole also analyzed items that were found in the apartment on Brick Church Pike. A "chunky" white powder was cocaine and weighed a total of 1.69 grams. Two bags contained a tan powder that was heroin. The first bag weighed 3.68 grams, and the second bag weighed 2.40 grams. A plant material was marijuana and weighed 2.66 grams. Forty-eight tablets were hydromorphone, a Schedule II drug, and had a total weight of 7.88 grams.

Lakeisha Smith testified that she was indicted in two cases, one of which was related to the Appellant's case. She pled guilty in both cases and received an effective twenty-year sentence. As part of Smith's plea agreement, she signed an affidavit explaining her role in the Appellant's case. At the time of the Appellant's trial, Smith was incarcerated.

Smith testified that in 2014, she was Jamarr Kuilan's girlfriend. Smith was married, but her husband was incarcerated, and she had five children that ranged in age from ten to nineteen years old. Smith owned a licensed daycare, and she lived in La Vergne. Jamarr moved in with Smith and began telling her about the Appellant. Jamarr claimed the Appellant was "going to plug him in so that he could make money selling drugs." One evening, Smith drove Jamarr to Murfreesboro to pick up the Appellant. Smith then drove the Appellant and Jamarr to an IHOP restaurant on Bell Road, and the Appellant met with someone in a black Hummer. Smith could not see who was in the Hummer because the windows were tinted. The Appellant met with the person "for some time." After the meeting, he got back into Smith's car, and she drove him and Jamarr to her home in La Vergne.

Smith testified that the three of them went into her master bedroom and that the Appellant "laid out" what appeared to be "methamphetamine, ice, and heroin." Smith had sold cocaine previously, but she had never seen methamphetamine or ice prior to that night. Smith said that she could tell from the Appellant's and Jamarr's conversation that Jamarr did not know anything about selling drugs. However, Jamarr's father, Juan Kuilan, had grown up in the Bronx, New York, and "kind of knew the ropes." Therefore, Jamarr was going to talk to Juan about selling drugs. The Appellant told Jamarr that Jamarr could obtain customers by giving people free samples of heroin and that "there would be a lot of profit."

Smith testified that Jamarr began selling heroin for the Appellant but that Jamarr was "having a hard time." Smith told Jamarr that if he could get cocaine from the Appellant, she would contact her "old" customers. Jamarr talked with the Appellant about selling cocaine. The Appellant began supplying Jamarr with cocaine, and Smith provided Jamarr with her former customers. Jamarr gave heroin to Juan, and Juan started selling

heroin. Smith said that Juan was "making quite a bit of profit" selling heroin and that Juan gave Jamarr five heroin customers "so that [Jamarr] could start and get it going himself."

Smith testified that in February 2014, she lost her daycare business due to a drug arrest, so she and Jamarr moved into an apartment with Jamarr's parents in Murfreesboro. The Appellant would bring drugs to Jamarr and Juan at the apartment. Juan had a girlfriend, Kimberly Jordan, and Smith and Jamarr sometimes would go to Jordan's apartment or the LeBlanc apartment to obtain drugs. Smith and Jamarr gave the money from their drug sales to the Appellant, and sometimes they would give him $2,000 per day. Smith said that she had seen the Appellant with a gun in his waistband, that it looked like a nine-millimeter handgun, and that she assumed he always had the gun on his person.

Smith testified that at some point, Jamarr got "locked up" for a probation violation and spent fourteen days in jail. During that time, Smith continued selling drugs for the Appellant. The Appellant told Smith that he would supply her with heroin and that she "would never run out." He taught her how to weigh the heroin powder, and he told her to sell the heroin for $200 per gram. Smith kept $70 from every sale. When Jamarr got out of jail, he resumed selling drugs. Smith and Jamarr would go to the Appellant's tire shop to pick up heroin and to drop off money, and Smith would see people coming to the tire shop to buy heroin. The Appellant was at the tire shop "sometimes." When he was not there, Smith and Jamarr obtained heroin from Mike Simpson and gave money to Simpson.

Smith testified that in November 2014, the Appellant and Crystal Hill "[got] into it." The Appellant told Smith that Hill wanted him to get all of his belongings out of Hill's apartment and that he was going to have someone pick up the backpack. Smith later learned the backpack had been seized by the police. After the seizure, the Appellant telephoned Jamarr and told him "to stop everything that was going on." A few days later, the Appellant met with Smith and Jamarr. Smith said the Appellant was "pretty tore up" and told them that "he couldn't believe this had happened." The Appellant thought his tire shop was being watched. The Appellant could no longer obtain heroin, and heroin sales stopped.

Smith testified that early one morning, Jamarr got a telephone call from Juan about a traffic stop. Juan's car had been stopped soon after Juan entered Tennessee, and Juan was hysterical. Juan later came to Smith's apartment, and Smith heard him arguing with Kimberly Jordan on the telephone about some drugs Jordan allegedly had disposed of. Later that day, the Appellant invited Smith and Jamarr to the Appellant's mother's house in Nashville for a meeting. On the way to Nashville, Jamarr told Smith that the Appellant had found another heroin supplier in Michigan. When Smith and Jamarr arrived at the Appellant's mother's house, a lot of people were there, including Vickie Brown. During

the meeting, the Appellant told Smith and Jamarr that the Appellant was going to supply Tennessee with heroin. The Appellant "seemed very excited about it."

Smith testified that the heroin came in brick form and that they would have to grind the heroin into powder in order to sell it. They were "cutting it with lactose" and storing the heroin at the LeBlanc apartment. Smith said that she went to the apartment one time and that Juan was there. Smith said that she saw Juan with "kilos" of heroin and that she knew the drug was heroin by its shape and size. She estimated that she and Jamarr earned $50,000 to $100,000 selling drugs for the Appellant. She said she would be eligible for parole in three years.

On cross-examination, Smith acknowledged that prior to her guilty plea, she was facing a maximum punishment of ninety-eight years. She pled guilty and received a twenty-year sentence as a mitigated offender. Her plea agreement required that she testify against the Appellant. Smith said that she did not have any ill feelings toward the Appellant and that she pled guilty "to have another chance with [her] grandchildren that had been born since [she was] locked up." Smith said that she was not forced to plea guilty but that "due process in this case may have not been what it should have been." Defense counsel showed Smith a letter she wrote to the trial court after she entered her guilty plea. In the letter, Smith said she had been "coerced." Smith told the jury that "maybe I used the wrong word in coerce" but that "I felt like I have been done wrong." She explained that she was in jail for a "long time" before she met with an attorney and that she "pretty much set [her]self up" by telling the police everything she knew about the drug operation. Smith acknowledged that Crystal Hill was angry at the Appellant when Hill gave the backpack to Simpson on November 22, 2014. Smith said she did not know if Hill put something in the backpack.

Forty-seven-year-old Vickie Brown acknowledged that she spent about four months in jail and that she pled guilty to conspiracy to sell heroin. In January 2015, Brown loaned money to the Appellant to "redo" his tire shop. Later that month, Brown met the Appellant at his mother's house to "hang out." A lot of people were there, including Lakeisha Smith and Jamarr Kuilan. Brown saw people using drugs in the home, but she did not see anyone selling drugs. The State asked if Brown saw heroin, and Brown said she did not remember. Brown then acknowledged signing an affidavit as part of her guilty plea, and the State asked her to read the affidavit to herself. Brown said she did not remember saying in her affidavit that she went to the Appellant's mother's house to "cut" heroin with the Appellant. She said she also did not remember saying in her affidavit that the Appellant had obtained the heroin in Michigan, that she saw four bags of heroin in the kitchen, and that she saw heroin being cut with a blender in the kitchen. Brown testified that she saw Smith and Jamarr with a bag of powder at the Appellant's mother's house. However, Brown did not

know the powder was heroin at that time. The next day, the police searched her apartment on Brick Church Pike.

After Brown's direct testimony, the State requested to admit her affidavit into evidence as a prior inconsistent statement pursuant to Tennessee Rule of Evidence 613(b) and argued that her statement was admissible as substantive evidence pursuant to Tennessee Rule of Evidence 803(26). After a jury-out hearing in which defense counsel was allowed to question Brown, the trial court agreed that Brown's prior statement was inconsistent with her testimony and ruled that the statement was admissible as substantive evidence.

On cross-examination, Brown acknowledged that the police found cocaine in a bra in her apartment and that the police told her she needed to cooperate. Brown was charged with a Class B felony but pled guilty to a Class C felony and was placed on probation. On redirect examination, Brown acknowledged that the police also found drugs in a tan jacket. The jacket belonged to the Appellant.

At the conclusion of Brown's testimony, the trial court allowed the State to read Brown's entire prior statement to the jury. In the statement, Brown said, in pertinent part, that the Appellant sold drugs, that she loaned him $15,000 to buy drugs, and that he went to Michigan to buy the drugs. The night Brown went to the Appellant's mother's house, Brown saw a blender in the house. The blender was used to cut heroin. Brown went into the kitchen and saw four bags of heroin.

After reading the statement to the jury, the State rested its case. The Appellant did not present any proof, and the jury convicted him as charged in count one of conspiracy to sell 150 grams or more of heroin and 300 grams or more of cocaine with at least one overt act occurring within a DFSZ and in count two of possession of 300 grams or more of cocaine with intent to sell or deliver within a DFSZ. The jury found him not guilty in counts three and four of possession of a firearm during the commission of a dangerous felony. After a sentencing hearing, the trial court sentenced the Appellant to twenty-five years for each conviction and ordered that he serve the sentences consecutively for a total effective sentence of fifty years.

## II. Analysis

Initially, we note that the Appellant has requested that we waive the timely filing requirement for his notice of appeal. On November 22, 2019, the trial court held a hearing on the Appellant's motion for new trial and made a cursory, oral statement denying the

motion. That same day, the trial court entered a written order denying the motion.[3] According to the Appellant's brief, defense counsel never received a copy of the order; therefore, in early January 2020, defense counsel prepared an order denying the motion for new trial and submitted the order to the trial court for the trial court's signature. The trial court signed the second order, the order was entered on January 7, 2020, and the Appellant filed his notice of appeal on January 10, 2020. Subsequently, defense counsel learned for the first time about the initial order.

A defendant must file a notice of appeal within thirty days of the order denying a motion for new trial. See Tenn. R. App. P. 4(a), (c). However, "in all criminal cases the 'notice of appeal' document is not jurisdictional and the timely filing of such document may be waived in the interest of justice." Tenn. R. App. P. 4(a). "'In determining whether waiver is appropriate this Court shall consider the nature of the issues for review, the reasons for the delay in seeking relief, and other relevant factors presented in each case.'" State v. Kevin Montrell Thompson, E2016-01565-CCA-R3-CD, 2017 WL 262701, at *2 (Tenn. Crim. App. at Knoxville Jan. 20, 2017) (quoting Michelle Pierre Hill v. State, No. 01C01-9506-CC-00175, 1996 WL 63950, at *1 (Tenn. Crim. App. at Nashville, Feb. 13, 1996)). The appellant bears the burden of establishing when the interest of justice mandates waiver of the timely filing of the notice of appeal. Id. (citing Tenn. R. App. P. 4(a)).

Here, the trial court entered the initial order denying the Appellant's motion for new trial on November 22, 2019, and the Appellant did not file his notice of appeal until January 10, 2020. Therefore, his notice of appeal was untimely. As noted by the Appellant, though, the initial order does not bear a certificate of service, supporting his claim that defense counsel never received a copy of the order. Defense counsel then prepared and submitted a second order, which the trial court signed and entered on January 7, 2020. The Appellant filed his notice of appeal just three days later. Under these circumstances, we conclude that a waiver of the timeliness of the notice of appeal is warranted.

### A. Sufficiency of the Evidence

The Appellant raises various claims regarding the sufficiency of the evidence for his conspiracy conviction. First, he contends that in order to support the conviction, the State was required to show that he conspired to sell 150 grams of heroin and 300 grams of cocaine to one buyer; instead, the State showed that he conspired to make numerous small drug sales to multiple buyers. Second, he contends that the State failed to show any heroin conspiracy occurred within a DFSZ and, in the alternative, that the State only showed the

---

[3] The order did not address any of the issues raised in the Appellant's motion for new trial or amended motion for new trial.

- 16 -

heroin conspiracy occurred within the zone of a preschool. Third, he contends that there was no corroboration of an agreement to sell heroin or cocaine. Finally, he contends that the evidence is insufficient to show he knowingly possessed cocaine because the State failed to show the backpack taken from Crystal Hill's apartment had not been tampered with after leaving his custody. The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

The Appellant was convicted of two offenses: (1) conspiracy to sell 150 grams or more of heroin and 300 grams or more of cocaine with at least one overt act occurring within a DFSZ and (2) possession of 300 grams or more of cocaine with intent to sell or deliver within a DFSZ. It is an offense for a defendant knowingly to sell a controlled substance, and it is an offense for a defendant knowingly to possess a controlled substance with intent to sell or deliver that controlled substance. Tenn. Code Ann. § 39-17-417(a)(3), (4). Tennessee Code Annotated section 39-12-103(a) provides that the

- 17 -

offense of conspiracy is committed if two (2) or more people, each having the culpable mental state required for the offense which is the object of the conspiracy and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct which constitutes such offense.

Additionally, "[t]he commission of an overt act in furtherance of the conspiracy is an essential element of the offense." State v. Thornton, 10 S.W.3d 229, 234 (Tenn. Crim. App. 1999).

The offense of conspiracy to sell 150 grams or more of heroin and 300 grams or more of cocaine and the offense of possession of 300 grams or more of cocaine with intent to sell or deliver are both Class A felonies. Tenn. Code Ann. § 39-17-417(j)(1), (5). At the time of the crimes, our Code provided that if the offenses occurred within 1,000 feet of the real property that comprised a public or private elementary school, middle school, secondary school, preschool, child care agency, public library, recreational center, or park, the defendant had to be punished one classification higher and was required to serve at least the minimum sentence for the defendant's appropriate range of sentence. Tenn. Code Ann. § 39-17-432(b)(1), (c) (2014). A defendant convicted of violating Tennessee Code Annotated section 39-17-417 near a preschool, childcare center, public library, recreational center, or park was subject to additional fines but not "additional incarceration." Tenn. Code Ann. § 39-17-432(b)(3) (2014).

Taken in the light most favorable to the State, the evidence at trial showed that the Appellant and numerous accomplices agreed to sell heroin and cocaine. Seven of those accomplices testified at trial about the Appellant supplying them with the drugs and about selling the drugs for him. Specifically, Mr. LeBlanc testified that he initially obtained heroin and cocaine from the Appellant as payment for construction work but that he ended up "fronting" heroin for the Appellant for about three months. Mr. LeBlanc said he obtained the heroin from the Appellant at the Appellant's tire shop. Mrs. LeBlanc testified that she and her husband sold heroin for the Appellant for several months, that the Appellant stored heroin in their home, and that he would come to her residence a couple of times per week to prepare the heroin for sale. Mrs. LeBlanc and Kimberly Jordan testified that Juan Kuilan also sold heroin for the Appellant. According to Jordan, the Appellant would bring the heroin to Juan at Jordan's apartment. Lakeisha Smith testified that Jamarr Kuilan tried selling heroin for the Appellant; however, Jamarr was "having a hard time" selling that drug, so the Appellant began supplying Jamarr with cocaine. Smith said she and Jamarr sold cocaine for the Appellant while Juan sold heroin for Appellant. Eventually, though, Juan gave some of his heroin customers to Jamarr, and Jamarr began selling heroin again. When Jamarr went to jail briefly, Smith continued selling heroin for

the Appellant. Smith said the Appellant even showed her how to weigh the heroin powder and told her to charge customers $200 per gram. Smith said that she and Jamarr went to the Appellant's tire shop to pick up heroin and to drop off money, and she estimated that they earned $50,000 to $100,000 selling drugs for the Appellant. This evidence is sufficient to show that the Appellant and his accomplices conspired to sell heroin and cocaine.

Regarding the amount of heroin in the conspiracy, Mrs. LeBlanc testified that the Appellant kept the heroin in a safe, that the safe was "full" of heroin, and that the Appellant told her the value of the heroin was about $80,000. According to Agent Noel, the value of one kilogram of China White heroin at that time was $80,000. Mrs. LeBlanc estimated that she and her husband sold twenty-five grams of heroin for the Appellant over a period of several months, and she said that Juan Kuilan claimed he was selling a quarter of a kilogram of heroin every few days. Smith testified that she saw Juan with "kilos" of heroin. Regarding the amount of cocaine in the conspiracy, the Appellant kept a backpack in a closet at Hill's apartment. Hill wanted the Appellant to get his belongings out of her residence, so on November 22, 2014, Mike Simpson retrieved the backpack, put the backpack into the Appellant's Excursion, and drove the backpack to the Appellant's tire shop. Simpson and Cecil Chapman then transferred the backpack from the Excursion to a Pontiac owned by the Appellant's long-time girlfriend. The police stopped the Pontiac, found the Appellant's wallet in the center console, and found the backpack in the trunk. The backpack contained two bricks of cocaine and items used to package drugs for resale. The weight of one brick alone was 541 grams.

In support of his argument that the State was required to show that he conspired to sell 300 grams of cocaine and 150 grams of heroin to one buyer at one time, the Appellant relies on State v. Cole Woodard in which this court stated, "'Where time and location separate and distinguish the commission of the offenses, the offenses cannot be said to have arisen out of a single wrongful act.'" No. W2011-02224-CCA-R3-CD, 2012 WL 4057266, at *3 (Tenn. Crim. App. at Jackson, Sept. 17, 2012) (quoting State v. Epps, 989 S.W.2d 742, 745 (Tenn. Crim. App. 1998)). However, that principle relates to multiplicity for purposes of double jeopardy analysis, not sufficiency of the evidence. See id. Tennessee Code Annotated section 39-12-103(e)(1) provides that a conspiracy "is a continuing course of conduct that terminates when the objectives of the conspiracy are completed or the agreement that they be completed is abandoned by the person and by those with whom the person conspired." The evidence in this case shows that the Appellant was the leader of an ongoing venture to sell heroin and cocaine. Moreover, the evidence shows that the total weight of the heroin was more than 150 grams and that the total weight of the cocaine was more than 300 grams. Therefore, the evidence is sufficient to support the conspiracy conviction.

Next, the Appellant claims that the State failed to show that the heroin conspiracy occurred within a DFSZ and, in the alternative, that the State only showed the heroin conspiracy occurred with the zone of a preschool. We note that for whatever reason, the State chose to charge the Appellant with a single count of conspiracy to sell heroin and cocaine in a DFSZ rather than separate counts of conspiracy to sell heroin in a DFSZ and conspiracy to sell cocaine in a DFSZ. In addition, the State alleged in count one of the superseding indictment that at least one overt act of the conspiracy occurred within one thousand feet of "a public or private elementary, middle or secondary school."

There were two school zones at issue in this case: Franklin Road Christian School and ICM Academy. As discussed above, the evidence is sufficient to show that the Appellant conspired to sell 150 grams or more of heroin and 300 grams or more of cocaine. The evidence also is sufficient to show that he kept the cocaine in a backpack at Hill's apartment, which was in the DFSZ of Franklin Road Christian School, and that he distributed heroin and accepted money for heroin sales at his tire shop, which was in the DFSZ of ICM Academy. At the time of the offenses, Franklin Road Christian School was a private elementary and secondary school, but ICM Academy was a preschool. Therefore, with regard to count one, the Appellant was subject to additional fines and was required to serve at least the minimum sentence for his appropriate range at one hundred percent but was specifically exempt from incarceration at the higher classification.[4] In any event, conspiracy to sell 150 grams or more of heroin and 300 grams or more of cocaine is a Class A felony even without the DFSZ enhanced penalty. See Tenn. Code Ann. § 39-17-417(j)(1), (5). Therefore, the Appellant is not entitled to relief on this issue.

As to the Appellant's claim that the evidence is insufficient because the State failed to present proof to corroborate the accomplices' testimony about an agreement to sell heroin or cocaine, a felony conviction in Tennessee may not rest solely upon the uncorroborated testimony of an accomplice. State v. Boxley, 76 S.W.3d 381, 386 (Tenn. Crim. App. 2001). Moreover, one accomplice cannot corroborate another. Id. Corroboration exists when there is some evidence, independent of the accomplice's testimony, which suggests not only that a crime has been committed but that the accused committed the crime. State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001). "'This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction.'" Id. (quoting State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994)). Ordinarily, it is up to the jury to determine whether sufficient corroboration exists. Id.

Turning to the present case, much of the State's proof against the Appellant consisted of testimony given by his accomplices regarding their obtaining heroin and

---

[4] We note that the sentencing hearing transcript is not in the appellate record.

- 20 -

cocaine from the Appellant and selling the drugs for him, the Appellant's trip to Michigan to obtain heroin, and the cocaine that the police found in the backpack. Latrisha Chapman was the first accomplice to testify for the State. She testified about the Appellant's wanting her and Mr. Chapman to pick up the backpack on November 22, their driving to the Appellant's tire shop to obtain the backpack from Mike Simpson, and the police stopping them and searching the backpack. Her testimony was corroborated by Agent Noel, who testified that law enforcement learned from the wiretap on the Appellant's telephone that someone was going to pick up a backpack at Crystal Hill's apartment. Agent Noel also testified about law enforcement witnessing the transfer of the backpack from Simpson to the Chapmans at the tire shop and about photographs that showed the transfer. Detective Gregory, who stopped the Chapmans and found the backpack in the trunk, also corroborated Mrs. Chapman's testimony.

Hill, who was the second accomplice to testify for the State, testified that the backpack was in a closet with the Appellant's belongings, that she saw drugs in the backpack, and that Simpson would make drug deliveries for the Appellant to the Mapco across the street from her apartment. Hill also testified about Simpson retrieving the backpack from her apartment on November 22, and Agent Noel's testimony about law enforcement watching as Simpson picked up the backpack from the apartment corroborated Hill.

Hill then testified about going to Michigan with the Appellant and about the Appellant obtaining heroin there. Hill stated that she rented two cars for the Appellant for the trip, and the State introduced into evidence a receipt from Enterprise Rent-A-Car, which showed that Hill rented two cars on January 9, 2015. The receipt, which also named the Appellant as the additional driver of the cars, corroborated Hill's testimony. Kimberly Jordan testified that she and Juan Kuilan also went on the trip to Michigan and that law enforcement stopped the car in which they were riding when they re-entered Tennessee. Agent Noel testified that law enforcement placed a GPS tracking device on one of Hill's rental cars, that law enforcement monitored the car to Michigan and back to Tennessee, and that the THP stopped the car that did not have the tracking device. Agent Noel's testimony corroborated Hill's and Jordan's testimony about the trip to Michigan.

Jordan also testified about the Appellant bringing drugs to Juan Kuilan at Jordan's apartment and about Kuilan packaging the drugs for resale. Detective Ward testified about searching Jordan and Kuilan's apartment and finding heroin, digital scales, and plastic baggies, which corroborated Jordan's testimony.

Wayne and Christina LeBlanc testified about selling heroin for the Appellant, and Mrs. LeBlanc testified that Mr. LeBlanc complained to the Appellant about the quality of the heroin. The State played a wiretap conversation between Mr. LeBlanc and the

Appellant for the jury, and the recording corroborated Mr. and Mrs. LeBlanc's testimony. Lakeisha Smith testified that in November 2014, the Appellant claimed he was going to send someone to Hill's apartment to pick up the backpack. Smith also testified about Jamarr Kuilan receiving a telephone call from Juan Kuilan; Juan was hysterical because his car had been stopped soon after he entered Tennessee. Agent Noel's testimony about Simpson retrieving the backpack from Hill's apartment on November 22 and Agent Noel's testimony about the THP stopping Juan's car on the way back from Michigan corroborated Smith's testimony.

Vickie Brown was the final accomplice to testify for the State. Brown testified about going to the Appellant's mother's house the day before law enforcement executed search warrants on various residences. Smith saw drugs in the home, including a bag of powder. Lieutenant Goney testified about executing the search warrant at the Appellant's mother's home and finding heroin powder. The Appellant's Excursion was parked outside the home, but the Appellant was not present. Meanwhile, Lieutenant Holton was executing a search warrant at Brown's apartment. The Appellant was there, and the police found heroin in a man's tan jacket and $2,000 on the Appellant's person. Brown testified that the jacket belonged to the Appellant, and Lieutenant Holton noted that the size of the jacket was consistent with the Appellant's size.

We note that "[i]t is not necessary that the corroboration extend to every part of the accomplice's evidence. Boxley, 76 S.W.3d at 386 (quoting Shaw, 37 S.W.3d at 903). Thus, we conclude that the State presented sufficient corroborated evidence that the Appellant conspired to sell 150 grams or more of heroin and 300 grams or more of cocaine within a DFSZ.

Finally, the Appellant claims that the evidence is insufficient to support his conviction of possession of cocaine with intent to sell or deliver within a DFSZ because the State failed to show that the backpack taken from Hill's apartment had not been tampered with after leaving his custody. We disagree with the Appellant.

Drug possession can be actual or constructive. State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). Constructive possession is "'the power and intention at a given time to exercise dominion and control over . . . [the drugs] either directly or through others.'" State v. Brown, 823 S.W.2d 576, 579 (Tenn. Crim. App. 1991). Hill testified that the Appellant spent every night at her home and that the backpack was in a closet with his belongings. Smith testified that Hill became angry with the Appellant and wanted him to get all of his belongings out of Hill's apartment, so the Appellant was going to have someone retrieve the backpack. On November 22, 2014, police officers watched Simpson drive from the Appellant's tire shop to Hill's apartment; saw Simpson leave the apartment with the backpack, put the backpack into the Appellant's Excursion, and drive the

Excursion to the Appellant's tire shop; and witnessed Mr. Chapman transfer the backpack from the Excursion to the trunk of the Pontiac. Mr. Chapman drove the Pontiac out of the parking lot, and the police followed him. Officers stopped Mr. Chapman, searched the Pontiac, and found the backpack, which contained two bricks of cocaine, in the trunk. Hill testified that she never put anything into the backpack, and the jury was in the best position to assess her credibility. Therefore, we conclude that the evidence also is sufficient to support the Appellant's conviction of possession of cocaine with intent to sell or deliver within a DFSZ.

## B. Motion to Suppress

The Appellant claims that the trial court erred by not granting his amended motion to suppress evidence. The State argues that the trial court properly denied the motion. We agree with the State.

Before trial, the Appellant filed a two-page motion to suppress "all evidence seized and otherwise gathered as a result of the GPS monitor, as well as the wiretaps used in the investigation leading to the indictment of [the Appellant]." In the motion, the Appellant stated that he "would like to develop the arguments in support of this motion" but that he could only offer "general grounds" for suppression due to the trial court's "recently imposed time restraints." The Appellant stated in the motion that he "reserves the right to develop a more thorough basis at the suppression hearing."

Two weeks before the suppression hearing, the Appellant filed an amended motion to suppress. The amended motion consisted of twelve pages and asserted that the trial court should suppress any evidence obtained from a "pen register" that was used to capture telephone numbers dialed from Jamarr Kuilan's telephone and from GPS tracking devices on several vehicles, including the Appellant's red Ford Excursion and a silver Ford Edge. As to the Excursion, the Appellant claimed that the affidavit in support of the GPS tracking order contained misleading statements, that the affidavit failed to establish probable cause due to the lack of corroboration, and that law enforcement tracked the Excursion while a tracking order was not in effect. Finally, the Appellant claimed that the wiretap application for his cellular telephone failed to establish the requisite amount of heroin, 150 grams, needed to issue the wiretap order; failed to establish a basis of knowledge for a CI's claim of repeatedly purchasing heroin from the Appellant at the Appellant's tire shop; and failed to establish necessity for the wiretap order.

The trial court held a suppression hearing on June 26, 2017. During the hearing, Agent Noel testified for the Appellant that he was the affiant for most of the GPS tracking orders and all of the wiretap orders in this case and that he obtained a GPS tracking order for the Appellant's Excursion. Agent Noel acknowledged that at some point, the tracking

order expired, and "there was about 30 days where there was no standing order."[5]  Law enforcement continued to track the Excursion while an order was not in effect, but the Appellant was not charged with any crime and the State was not going to use any tracking evidence obtained during that period of time as proof at trial.  Agent Noel acknowledged that the backpack containing the cocaine was found after the Excursion's first tracking order expired and before the second tracking order was issued.

At that point, defense counsel began questioning Agent Noel about the pen register for Jamarr Kuilan's telephone.  The State objected, arguing that the Appellant did not have standing to challenge that pen register.  The trial court agreed with the State, so defense counsel began questioning Agent Noel about "any pen registers" for the Appellant's telephone.  The State again objected, arguing that "[t]here is only one pen register mentioned in the motion to suppress."  The trial court sustained the objection and stated that "we are here on a motion to suppress a wiretap as I see it.  That is the only thing before the Court."  Defense counsel responded that counsel "did raise the issue of pen registers and GPS in my motion" and "did argue outside of the wiretap."  The trial court advised defense counsel that "somehow your motion to suppress is not [in] the file here.  I wonder what's happened to it."  Defense counsel stated that "I do have an amended one," but the transcript does not reflect whether defense counsel provided the trial court with a copy of the amended motion to suppress.

Subsequently, defense counsel began questioning Agent Noel about his affidavit in support of the wiretap order for the Appellant's cellular telephone, and counsel spent the remainder of Agent Noel's direct examination on that issue.  Agent Noel testified that on October 27, 2014, he applied for a wiretap order for Jamarr Kuilan's cellular telephone.  At that time, Kuilan was the primary target of the heroin investigation.  In the affidavit, Agent Noel described Kuilan as a "mid-level dealer" who sold heroin to "a large number of individuals."  Agent Noel's affidavit also included a chart that listed twenty controlled heroin buys from "target subjects" between July 8, 2014, and October 8, 2014, and the amount of heroin purchased in each transaction.  According to the chart, law enforcement bought a total of forty-one grams of heroin.  However, beneath the chart, Agent Noel noted that the TBI Crime Laboratory had confirmed the presence of heroin in only two of the drug buys.  Agent Noel denied that the chart was misleading regarding the amount of heroin obtained by law enforcement and stated, "I believe every single controlled purchase was field tested."  Agent Noel acknowledged that none of the heroin in the chart was purchased from the Appellant.

---

[5] The record reflects that two tracking orders were issued for the Excursion.  The first order was issued on September 12, 2014, and the second order was issued on December 15, 2014.  Both orders were valid for sixty days.

Agent Noel testified that based on the information in the affidavit, a criminal court judge issued a wiretap order for Jamarr Kuilan's telephone. Agent Noel began intercepting drug-related calls between Kuilan and the Appellant. As a result of those calls, Agent Noel applied for a wiretap order for the Appellant's cellular telephone on November 4, 2014. Agent Noel's affidavit in support of the Appellant's wiretap "incorporated" all of the information from Agent Noel's affidavit in support of Jamarr Kuilan's wiretap. Regarding the necessity for the Appellant's wiretap, Agent Noel wrote in the affidavit, "I am incorporating by reference in this Application the Consideration of Alternative Investigative Procedures section contained in the Application for the Inception of [Kuilan's telephone] previously approved by this court." Agent Noel acknowledged that in his affidavit for Kuilan's wiretap, Agent Noel had stated that surveillance of Kuilan's residence would be difficult due to safety issues. In contrast, Agent Noel stated in his affidavit for the Appellant's wiretap that Agent Noel had been surveilling the Appellant in the Appellant's neighborhood "regularly." Agent Noel acknowledged that some of the "safety issues" law enforcement faced in Kuilan's neighborhood did not exist in the Appellant's neighborhood. Agent Noel explained that the Appellant "lived in a much nicer neighborhood" than Kuilan but that law enforcement probably still would have been unable to conduct surveillance in the Appellant's neighborhood without being detected. Agent Noel said that he obtained information about the conspiracy to sell heroin from CIs and co-conspirators but that the wiretap for the Appellant's telephone was necessary because "you can't depend upon that in order to conduct an investigation."

On cross-examination, the State asked Agent Noel if law enforcement used the GPS tracking device on the Excursion to obtain the backpack on November 22, 2014. Defense counsel objected and said, "That's outside of the four corners of the warrant and outside of the application." The trial court stated that "the GPS is not part of it" but overruled defense counsel's objection and allowed Agent Noel to answer. Agent Noel testified that on November 22, 2014, he learned from the Appellant's wiretap that the backpack was going to be moved from Hill's apartment. At that time, the first GPS tracking order for the Appellant's Excursion had expired. Agent Noel "physically observed" the Excursion leave the Appellant's tire shop and travel toward Hill's apartment complex. Law enforcement saw the Excursion arrive at Hill's apartment complex and saw Simpson load the backpack into the Excursion. Agent Noel then followed the Excursion back to the tire shop and witnessed the transfer of the backpack to the maroon Pontiac. Later that day, law enforcement found the backpack in the Pontiac. Agent Noel said that law enforcement did not use the Excursion's GPS tracking device to obtain the backpack.

The State proceeded to question Agent Noel about evidence obtained from the Excursion's GPS tracking device while the first tracking order was expired. Defense counsel objected and stated as follows:

Your Honor, I'm going to object to this line of questioning. I'm sorry, I don't understand. If this is a motion to suppress and we are supposed to be considering suppressing the evidence from the wiretap, why are we questioning the officer about times when he was surveilling a GPS when he didn't have an order to do so? That doesn't seem relevant.

The trial court responded that "I will see where we are going" and allowed the State to continue. Agent Noel testified about four incidents of surveillance with the GPS tracking device that occurred while the first tracking order was expired.

On July 3, 2017, the trial court issued an order denying the Appellant's motion to suppress. In the order, the trial court, quoting the Appellant's initial motion to suppress, stated that the Appellant offered "'only general grounds for suppression and reserve[d] the right to develop a more thorough basis at the suppression hearing.'" The trial court then stated as follows:

At the hearing, however, the [Appellant] was only able to raise two issues for the Court's consideration: whether the necessity of the wiretaps was sufficient to support the Issuing Court's order, and whether the initial wiretap application established probable cause required that the goal of the conspiracy was to sell 150 grams or more of heroin, in order to lawfully obtain a wiretap order.

The trial court proceeded to address only those two issues and found that the wiretap application for the Appellant's cellular telephone provided a substantial basis for the issuing court to find probable cause and necessity for the wiretap.

On appeal, the Appellant initially claims that the trial court's order "intentionally failed to address" many of the suppression issues raised in the amended motion to suppress. We agree that the amended motion to suppress raised various issues in addition to the wiretap order issued for the Appellant's telephone. However, the trial court's order denying the motion to suppress referred only to the Appellant's initial motion. We note that when the trial court stated at the suppression hearing that the only issue was the wiretap order, defense counsel advised the trial court about the amended motion to suppress. Nevertheless, the trial court continued to assert during the hearing that the only issue before the court related to the wiretap. Defense counsel apparently acquiesced to the trial court's assertion, objecting to Agent Noel's cross-examination about evidence obtained while the tracking orders for the Excursion were not in effect and stating that the evidence was irrelevant because "we are supposed to be considering suppressing the evidence from the wiretap." Moreover, defense counsel only addressed the wiretap order during counsel's closing argument, and defense counsel did not request a ruling on any of the other issues

raised in the amended motion after the trial court filed its order denying the motion to suppress. Therefore, we conclude that those issues have been waived and will only consider the two issues addressed in the trial court's order. See Tenn. R. App. P. 36(a).

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the prevailing party is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23.

The Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect citizens against unreasonable searches and seizures. Our supreme court has stated that

> [t]he Fourth Amendment to the United States Constitution requires that search warrants issue only "upon probable cause, supported by Oath or affirmation." Article I, Section 7 of the Tennessee Constitution precludes the issuance of warrants except upon "evidence of the fact committed." Therefore, under both the federal and state constitutions, no warrant is to be issued except upon probable cause. Probable cause has been defined as a reasonable ground for suspicion, supported by circumstances indicative of an illegal act.

State v. Henning, 975 S.W.2d 290, 294 (Tenn. 1998) (footnote and citations omitted).

"[A] finding of probable cause supporting issuance of a search warrant must be based upon evidence included in a written and sworn affidavit." Id. The issuing judge uses a totality-of-the-circumstances analysis to determine whether the affidavit establishes probable cause. State v. Tuttle, 515 S.W.3d 282, 305 (Tenn. 2017). In examining the affidavit, this court's standard of review is limited to whether the issuing judge had "'a substantial basis for concluding that a search warrant would uncover evidence of wrongdoing.'" Id. at 299 (quoting State v. Jacumin, 778 S.W.2d 430, 432 (Tenn. 1989)). We note that "'affidavits must be looked at and read in a commonsense and practical manner', and . . . the finding of probable cause by the issuing magistrate is entitled to great deference." State v. Bryan, 769 S.W.2d 208, 211 (Tenn. 1989) (quoting State v. Melson, 638 S.W.2d 342, 357 (Tenn. 1982)).

Tennessee Code Annotated section 40-6-304, part of the Wiretapping and Electronic Surveillance Act, provides as follows regarding an order for electronic surveillance:

> (c) Upon an application the judge may enter an ex parte order, as requested or as modified, authorizing interception of wire, oral or electronic communications within the district in which the judge is sitting, and outside that district but within the state of Tennessee in the case of a mobile interception device, if the judge determines on the basis of the facts submitted by the applicant that:
>
> > (1) There is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in § 40-6-305;
> >
> > (2) There is probable cause for belief that particular communications concerning that offense will be obtained through the interception;
> >
> > (3) Normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous; and
> >
> > (4) There is probable cause for belief that the facilities from which, or the place where, the wire, oral or electronic communications are to be intercepted are being used, or about to be used, in connection with the commission of the offense, or are leased to, listed in the name of, or commonly used by the person.

Tennessee Code Annotated section 40-6-305 provides that a district attorney general may apply for an order authorizing the interception of wire, oral, or electronic communications by investigative or law enforcement officers when the interception may provide evidence of (1) criminal homicide, (2) criminal conspiracy to commit criminal homicide, (3) certain drug offenses, (4) the commission of, or conspiracy to commit, a criminal gang offense by a criminal gang member, or (5) the commission of trafficking a person for a commercial sex act. A district attorney general may apply for and a judge may authorize the interception of wire, oral, or electronic communications pursuant to section 40-6-305(3) if the drug offense involves 150 grams or more of any substance containing heroin. Tenn. Code Ann. §§ 39-17-417(j)(1), 40-6-305(3).

1.  Probable Cause

The Appellant claims that the wiretap application for his cellular telephone did not establish probable cause to believe that the conspiracy involved 150 grams or more of heroin because "the government offered precisely zero evidence of any transaction over 150 grams." The Appellant also contends that because the affidavit in support of Jamarr Kuilan's wiretap stated that the police had purchased only 41.5 grams of heroin from various subjects, the Appellant's wiretap application "simply did not present the type of largescale movement that the wiretap statute was designed to combat." We disagree with the Appellant.

Agent Noel's affidavit in support of the wiretap for Kuilan's cellular telephone consisted of fifty-six pages and 160 numbered paragraphs. In the affidavit, Agent Noel stated that law enforcement was investigating Kuilan "and others identified and as yet unidentified" in a drug trafficking organization (DTO) of conspiring to deliver and sell 150 grams or more of heroin in the Murfreesboro area. Agent Noel then provided the following information that was obtained from CIs: CI-1 told investigators that CI-1 had purchased heroin regularly from "Big E" and that CI-1 had purchased heroin inside Big E's tire shop on Church Street. Between July 8, 2014, and October 8, 2014, CI-2 participated in twenty controlled heroin buys from various targets, including Lakeisha Smith and Jamarr Kuilan. The total amount of heroin purchased in those buys was 41.5 grams, and Agent Noel provided specific information about each heroin buy in a chart. On August 13, 2014, CI-3 told law enforcement that Big E was the Appellant and that the Appellant recently had bought a tire shop in Murfreesboro. CI-3 claimed that in June or July 2014, the Appellant contacted CI-3 and asked if CI-3 knew anyone who could "get rid of" three ounces of heroin. Three ounces of heroin was about eighty-five grams. CI-3 told the Appellant that he did not know anyone who could sell the heroin.

According to Agent Noel's affidavit, on two occasions in August 2014, law enforcement instructed CI-4 to enter the tire shop and attempt to initiate conversations about drugs. However, CI-4 was unable to get anyone in the tire shop to engage in such conversations. On August 26, 2014, CI-4 met with Big E. After the meeting, law enforcement showed a driver's license photograph of the Appellant to CI-4, and CI-4 confirmed that Big E was the Appellant. On September 3, 2014, officers were observing a controlled drug transaction between CI-5 and Rafferty Hatfield. During the transaction, Hatfield told CI-5 that Wayne LeBlanc was Hatfield's supplier. On September 9, 2014, officers watched LeBlanc and the Appellant meet in a McDonald's parking lot. LeBlanc got into the Appellant's Excursion briefly. LeBlanc then went back to his own car, and both vehicles left the parking lot. LeBlanc returned to his apartment complex, and the Appellant went to the tire shop. Records from the Tennessee Secretary of State confirmed

that the Appellant was a co-owner of the shop. Law enforcement installed a camera near the tire shop but saw "very little car repair or tire related business occurring."

Agent Noel stated in his affidavit that on September 17, 2014, a police officer conducted a traffic stop of a vehicle that was leaving Jamarr Kuilan's residence. The woman who was driving the vehicle had one-half gram of heroin in her waistband and stated that she had purchased the heroin from Kuilan. She also stated that she had been purchasing one-half gram of heroin from Kuilan daily for the past six to eight months and that Kuilan and the Appellant "had initially gotten her hooked on heroin by giving it to her free of cost." Two days later, Agent Noel met with the officer who had conducted the woman's traffic stop. The officer told Agent Noel that on June 26, 2014, he had assisted with "a routine probation check" on Kuilan at Kuilan's residence. During the probation check, the officer noticed an odor of marijuana coming from the residence, but Kuilan refused to give consent to search, claiming that it was his mother's residence. The Appellant was present at the residence, asked to leave the premises, and told the officer that he was on probation. The Appellant "urgently" wanted to leave, and the officer allowed him to do so after confirming the Appellant's identity. The Appellant drove away in the red Excursion.

Agent Noel also stated in his affidavit that on October 2, 2014, police officers encountered a vehicle parked in a parking lot in downtown Murfreesboro. A search of the vehicle revealed seventeen small packs of heroin. The driver of the vehicle, Paul Fetty, told officers that he obtained his cocaine and heroin from Jamarr Kuilan. Fetty also said that he used to work at the Appellant's tire shop and that the Appellant paid him for two weeks of work entirely with heroin. Fetty said that he had never seen the Appellant with drugs but that Fetty understood the Appellant "to be in charge and financing the operation." Fetty claimed that the tire shop was not a legitimate business and that it only existed "as a cover for their narcotics activities."

Agent Noel stated in his affidavit that on July 29, 2014, a GPS tracking device was installed on Jamarr Kuilan's Dodge Charger. The device provided information such as the Charger's direction of travel, speed, and duration of stops. Using that information over a forty-four-day period, Agent Noel determined from his training, knowledge, and experience whether a "trip" in the Charger was consistent with a drug transaction. In Agent Noel's opinion, Kuilan made 361 trips in the Charger that were consistent with drug transactions.

Agent Noel then explained in paragraphs 119 to 121 about the amount of heroin involved in the conspiracy:

119. Tennessee Code Annotated § 40-6-305 requires a violation of one of several predicate offenses before investigators can secure intercept authority. One such offense is Tenn. Code Ann. §39-17-417(j), which includes a conspiracy to distribute in excess of one hundred and fifty (150) grams of heroin as a Schedule I substance. Based upon the information set forth above and the calculations described in this section, it is my opinion that the total amount of heroin being distributed by this DTO (including Eric Patton, "Slim", LeBlanc, Hatfield, and KUILAN) exceeds the statutory requirements set forth in § 40-6-305.

120. The total amount was calculated by first calculating the number of grams of heroin already purchased from TARGET SUBJECTS. Since July 8, 2014, investigators have purchased on a regular basis from KUILAN and LeBlanc (and now 'Slim') approximately 41.6 grams of heroin (including 1.7 grams purchased from LeBlanc through Hatfield). That amount of heroin was purchased in 20 controlled transactions - or an average of approximately 2.08 grams per transaction.

121. As demonstrated above, KUILAN has made 361 trips over a forty-four (44) day period previous to the writing of this application (averaging 8.2 trips per day). At 8.2 trips per day and 0.25 grams per trip, it would take KUILAN approximately 73 days to sell 150 grams of heroin (8.2 trips * 0.25 grams per trip = 2.05 grams per day; 150 grams / 2.05 = 73.17 days). This investigation has been ongoing for 106 days (as of October 21, 2014). At 8.2 trips per day and 0.50 grams per trip, it would take KUILAN approximately 36 days to sell 150 grams of heroin (8.2 grams * 0.5 grams per trip = 4.1 grams per day; 150 grams / 4.1 grams per day = 36.58 days). At 8.2 trips per day and 1.0 grams per trip, it would take KUILAN approximately eighteen (18) days to sell 150 grams of heroin (8.2 trips * 1.0 grams per trip = 8.2 grams per day; 150 grams / 8.2 grams per day = 18.29 days). At 8.2 trips per day and two (2.08) grams per trip (the average in the controlled transactions with the TARGET SUBJECTS), KUILAN would meet the statutory minimum for a wiretap in approximately eight (8) days (8.2 days * 2.1 grams per trip = 17.06 grams per day; 150 grams / 17.06 grams per day = 8.8 days to meet statutory minimum) and would have distributed 757.68 grams of heroin during his forty-four day period (8.2 trips * 2.1 grams per trip = 17.22 grams per day; 44 days * 17.22 grams per day = 757.68 grams).

Agent Noel noted that LeBlanc, Woodward, and Slim also were believed to be selling heroin as part of the conspiracy. On October 27, 2014, Judge David M. Bragg granted Agent Noel's application and issued a wiretap order for Jamarr Kuilan's cellular telephone.

Nine days later, Agent Noel submitted an affidavit in support of a wiretap for the Appellant's cellular telephone. The affidavit consisted of only fifteen pages and thirty-five numbered paragraphs but specifically incorporated Agent Noel's affidavit for Kuilan's wiretap. In the affidavit for the Appellant's wiretap, Agent Noel stated that law enforcement was investigating the Appellant for conspiring to deliver and sell 150 grams or more of heroin in the Murfreesboro area. Agent Noel then quoted telephone conversations between Kuilan and the Appellant on October 31, 2014. Although the Appellant and Kuilan did not use the word "heroin" in their conversations, Agent Noel explained why he thought they were talking about the drug and why he thought the Appellant was supplying Kuilan with heroin. Specifically, a CI had told a DEA detective that on October 30, 2014, the CI was present when Big E purchased one-half ounce of heroin from "Don Don." The CI learned that Big E had purchased another one-half ounce of heroin from Don Don earlier but that Big E had returned to purchase the second one-half ounce "of better quality" heroin because Big E was not satisfied with the quality of the first one-half ounce of heroin. A GPS tracker on the Appellant's Excursion confirmed that the Excursion was located where the CI claimed to be at the time of the Appellant's heroin buy from Don Don. Agent Noel stated that the Appellant's purchase of heroin from Don Don on October 30 was consistent with a telephone conversation between Kuilan and "Sara" on October 30 in which Sara complained about the quality of heroin she had bought from Kuilan. Agent Noel stated that in his opinion, Big E was the Appellant and that the Appellant had supplied Kuilan with the poor-quality heroin that Kuilan had sold to Sara, which explained why the Appellant needed to purchase the second one-half ounce of heroin from Don Don. On November 5, 2014, Judge Bragg issued a wiretap order for the Appellant's telephone.

In its order denying the motion to suppress, the trial court correctly noted that the issuing court was not required to find probable cause that the Appellant actually sold 150 grams of heroin in order to issue the wiretap order; instead, the issuing court was required to find probable cause to believe that the goal of the conspiracy was to sell 150 grams or more of heroin. The trial court then concluded that the following information in Kuilan's wiretap application established probable cause to issue the Appellant's wiretap order:

> (1) Details of multiple controlled purchases of heroin from co-conspirators in the aggregate amount of approximately 40 grams;
>
> (2) An offer by [the Appellant] to give [CI-3] approximately 85 grams of heroin to resell; and

- 32 -

(3)  An extensive extrapolation of GPS tracking data from Jumarr Kuilan's vehicle [in] relation to documented trips by Kuilan during numerous detailed controlled buys of heroin.

We agree with the trial court that there was a substantial basis for the issuing court to find probable cause that the Appellant was involved in a conspiracy to sell 150 grams or more of heroin.  The affidavit in support of Kuilan's wiretap provided detailed evidence that a conspiracy to sell heroin was occurring, that the conspiracy involved 150 grams or more of heroin, and that Kuilan and the Appellant were involved in the conspiracy.  The affidavit in support of the Appellant's wiretap provided additional evidence that the Appellant was not only involved in the conspiracy but that he was the supplier of the heroin.  Therefore, the Appellant is not entitled to relief.

2.  Necessity

Next, the Appellant claims that the wiretap application for his cellular telephone did not show necessity because the affidavits did not establish that other investigative methods had been tried and failed, appeared unlikely to succeed, or appeared too dangerous.  He also contends that the wiretap application was "flawed because it wholly incorporated by reference the 'necessity' section from [Kuilan's] wiretap application."

In Agent Noel's affidavit in support of the Appellant's wiretap, Agent Noel wrote, "I am incorporating by reference in this Application the Consideration of Alternative Investigative Procedures section contained in the Application for the interception of [Jamarr Kuilan's telephone] previously approved by this court."  In that section of Kuilan's wiretap application, Agent Noel explained that based on his experience, physical surveillance of a suspected drug trafficker was limited because physical surveillance only provided evidence of an apparent delivery of drugs to a "target" or an apparent pickup of drugs by a target.  If the target delivered the drugs, the customer receiving possession of the drugs could be arrested while the target and the target's supplier likely evaded prosecution.  If the target received the drugs, the target's supplier evaded prosecution because the supplier usually used a "mule" to deliver the drugs to the target.  Agent Noel also explained that "[t]he identities of customers, suppliers, locations of stash houses, locations of drug proceeds, the identity and location of assets purchased with drug proceeds, and the size and scope of the operations [cannot] be determined by physical surveillance."

Regarding this specific drug trafficking organization, Agent Noel stated that law enforcement had conducted physical surveillance of Jamarr Kuilan "with some measure of success" but that "surveillance by itself does not reach the level of evidence that can be

used to convict the participants. Furthermore, maintaining effective and undetected surveillance of several individuals and several vehicles all coming and going from multiple addresses requires manpower and surveillance vehicles far in excess of that available." According to Agent Noel's affidavit, surveillance of Kuilan's residence was difficult due to "the high volume of foot traffic in the area and the sensitivity to law enforcement presence in that area." Agent Noel noted that officers sitting in vehicles likely would attract the attention of residents and that it was not uncommon for residents to approach surveillance vehicles and question why officers were there. Agent Noel stated that physical surveillance of other residences where Kuilan was believed to be staying or storing drugs would be difficult for the same reasons.

Agent Noel acknowledged in his affidavit that investigators had used five CIs in this investigation but said that the CIs did not know "the full extent and details of the operation." He also stated that the use of CIs "does not clearly identify the locations where drugs and other evidence is stored, nor have their controlled transactions identified who the source of supply for heroin or where the proceeds of the conspiracy are being distributed or kept." Agent Noel noted that CI-1 had purchased heroin from the Appellant at the tire shop but that CI-1 was not in a position to gain valuable information about the "inner workings" of the organization. Likewise, CI-2 had made numerous purchases of heroin, but none of the conspirators had shared any information with CI-2 regarding the source of the heroin, the storage locations for the heroin, the methods of transporting the heroin, the distribution of proceeds, "or other information critical to achieving the investigative goals of this investigation." Agent Noel stated that CI-3 was not involved with the conspirators and that "it would raise suspicions" if CI-3 were able to buy heroin from the Appellant. Agent Noel said that CI-4 had attempted to inform the conspirators that CI-4 was involved in drugs but that CI-4 had not received any response from the Appellant or Juan Kuilan, which indicated that "this is a tight-knit group not eager to bring in outsiders." Agent Noel stated that CI-5 had never met the suspected conspirators and that "[s]hould investigators direct a [CI] to inquire about such matters, it is highly likely that the [CI] would no longer be trusted or dealt with."

Agent Noel stated in the affidavit that he thought the use of undercover officers was unlikely to succeed because "it is much more difficult to have an undercover officer infiltrate an organization to the level that would allow him or her to have access to information and intelligence that would meet or exceed that available to a [CI] who is involved in the criminal activity." Agent Noel also thought the use of undercover officers was "too dangerous to employ" and explained why the general questioning of individuals, the use of search warrants, and the review and analysis of telephone records would not achieve the goals of the investigation in this case.

At the suppression hearing, defense counsel questioned Agent Noel briefly about the necessity for the Appellant's wiretap. Agent Noel acknowledged that in his affidavit in support of the Appellant's wiretap, he wrote that law enforcement had been surveilling the Appellant at his residence "regularly." Agent Noel explained that the Appellant lived in a "much nicer" neighborhood than Kuilan; therefore, law enforcement could conduct surveillance in the Appellant's neighborhood without danger. He stated, though, that law enforcement probably could not conduct surveillance in the Appellant's neighborhood without being detected.

The trial court stated in its order denying the motion to suppress that paragraphs 127 through 153 of the affidavit in support of Kuilan's wiretap provided specific reasons for the need for the Appellant's wiretap. The trial court found that the issuing judge "clear[ly]" had enough information to conclude that the wiretap for the Appellant's telephone was necessary for the investigation.

The necessity requirement for a wiretap order is "'simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.'" State v. Moore, 309 S.W.3d 512, 525 (Tenn. Crim. App. 2009) (quoting United States v. Kahn, 415 U.S. 143, 153 n.12 (1974)). Therefore, "'[a]ll that is required is that the investigators give serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate.'" Id. (quoting United States v. Lambert, 771 F.2d 83, 91 (6th Cir. 1985). A wiretap does not need to be used as a last resort. Id. at 526. However,

> a purely conclusory affidavit unrelated to the instant case and not showing any factual relations to the circumstances at hand would be . . . an inadequate compliance with the statute. . . . [Rather,] the mere fact that the affidavit . . . rested in part on statements that would be equally applicable to almost any [similar] case does not render the affidavit insufficient. What is required in addition, however, is information about particular facts of the case at hand which would indicate that wiretaps are not being routinely employed as the initial step in criminal investigation.

State v. King, 437 S.W.3d 856, 874-75 (Tenn. Crim. App. 2013) (quoting Moore, 309 S.W.3d at 526) (quoting United States v. Landmesser, 553 F.2d 17, 20 (6th Cir. 1977))) (internal quotations and citations omitted).

As to the Appellant's claim that it was improper to issue a wiretap order for the Appellant's telephone based on information contained in the application for Kuilan's wiretap, the necessity section in Agent Noel's affidavit for the Appellant's wiretap

specifically incorporated by reference the necessity section in Agent Noel's affidavit for Kuilan's wiretap, and both affidavits related to the same, ongoing investigation. See Moore, 309 S.W.3d at 528 (stating that information contained in a previous wiretap application and properly incorporated into a subsequent wiretap application "retains its relevance and applicability due to the Defendant's suspected membership in [the same] drug-trafficking organization"). Therefore, it was not improper for the issuing judge to consider information contained in Kuilan's wiretap application.

As to the necessity for the Appellant's wiretap, the trial court stated in its order denying the motion to suppress that paragraphs 127 through 153 of the affidavit in support of the wiretap for Jamarr Kuilan's telephone gave specific reasons for the need for the Appellant's wiretap and that the issuing judge "clear[ly]" had enough information to conclude the wiretap was necessary for the investigation. Again, we agree with the trial court. The Appellant's wiretap application provided general information about the difficulties involved with investigating large-scale drug trafficking organizations and the difficulties involved with investigating this drug-trafficking organization. The application discussed how further physical surveillance, the use of CIs, the infiltration by undercover officers, the use of general questioning, the use of search warrants, and the review and analysis of telephone records could not achieve the goals of the investigation. The application also provided specific information as to why the use of CIs in relation to the Appellant had been and would be unsuccessful. Therefore, the issuing court had a substantial basis to find that normal investigative procedures had been tried and had failed, that normal investigative procedures reasonably appeared unlikely to succeed if tried, or that normal investigative procedures appeared to be too dangerous. Accordingly, the trial court did not err by denying the Appellant's motion to suppress.

## C. Identities of Confidential Informants

The Appellant claims that the trial court erred by not compelling the State to identify its CIs. The State argues that the trial court did not err. We agree with the State.

Before trial, the Appellant filed a motion to compel the State to disclose the identities of five CIs. During a hearing on May 1, 2017, the State advised the trial court that law enforcement used the CIs "to initiate wire taps in this case" but argued that "there is no legal requirement to reveal the confidential sources of information used in a wire tap or a search warrant." The State noted that it was not going to call any of the CIs to testify at trial. Defense counsel responded that he subpoenaed Agent Noel to the hearing so that Agent Noel could testify about the involvement of the CIs in the case but that Agent Noel was not present. The trial court reviewed the subpoena and stated that Agent Noel apparently had not been served. Defense counsel offered to introduce the wiretap affidavits into evidence in lieu of Agent Noel's testimony "[to] show to the Court the references to

the five confidential informants and exactly what [Agent Noel] was testifying to that they witnessed and their participation."

As stated previously, the wiretap application for the Appellant's telephone incorporated by reference the information contained in the application for Jamarr Kuilan's wiretap. Agent Noel's affidavit in support of Kuilan's wiretap provided as follows: CI-1 informed law enforcement in June 2014 that Big E was distributing heroin in the Murfreesboro area, that CI-1 bought heroin from Big E regularly, and that CI-1 bought heroin in Big E's tire shop. In July 2014, CI-2 told law enforcement that CI-2 could obtain heroin from an individual named "Ford" and that a white female claimed Ford was obtaining the heroin from Big E. In August 2014, CI-3 informed law enforcement that he had known Big E since they were children, that Big E was the Appellant, and that the Appellant had asked if CI-3 knew anyone who could "get rid of" three ounces of heroin. Also in August 2014, law enforcement sent CI-4 into a tire shop on two occasions to initiate conversations about narcotics; however, CI-4 was unable to engage any individuals in conversations about drugs. Finally, during a controlled heroin buy between CI-5 and codefendant Hatfield in September 2014, Hatfield told CI-5 that Wayne LeBlanc was Hatfield's supplier. Defense counsel asserted that the State should be required to reveal the identities of the five CIs because CI-1, CI-2, CI-3, and CI-5 were witnesses to a crime and because the information provided by CI-4 was exculpatory.

During a subsequent hearing on May 22, 2017, defense counsel advised the trial court that the identity of CI-2 had been disclosed. However, defense counsel renewed the Appellant's motion to compel the identities of the remaining four CIs. The trial court ruled as follows:

> It appears to me that there is no basis to reveal their identities. I'm going to deny that motion. There doesn't -- there is no particular evidence that would be disclosed by that that would be useful, it doesn't appear to me, based on what they did. Their testimony was simply -- or their information was simply enough for them to get a search warrant it would look like. And there is no -- nothing that they would be involved with as far as anything to be necessary for the defense of these charges it doesn't appear to me. So, I'm going to deny that motion.

On appeal, the Appellant claims that the trial court should have compelled the State to reveal the identities of the four remaining CIs because all of them were participants or witnesses to the heroin conspiracy and because CI-4 provided exculpatory information by showing that the Appellant was "unwilling to sell heroin." The State argues that the trial court properly denied the Appellant's motion because the Appellant failed to show that the identities of the CIs were material to his case. Specifically, the State argues that while law

enforcement relied on the information provided by the CIs to obtain the wiretap for the Appellant's telephone, the prosecution did not rely on any of their information to prove the State's case at trial. The State notes that none of the CIs testified at trial and that the prosecution's proof mainly consisted of the testimony by seven of the Appellant's accomplices and the testimony of the police officers who participated in the investigation. The Appellant responds that because the indictment alleged that the conspiracy began on January 1, 2014, whereas the wiretap order was not issued until October 27, 2014, the CIs obviously were witnesses to the heroin conspiracy.

Generally, the State is not required to reveal the identity of a CI unless the CI participated in the crime, witnessed the crime, or has knowledge that is favorable to the defendant. State v. Ostein, 293 S.W.3d 519, 528 (Tenn. 2009). "Stated succinctly, an informer's identity 'cannot be concealed from the defendant when it is critical to his case.'" Id. (quoting Branzburg v. Hayes, 408 U.S. 665, 698 (1972)). However, if the CI is merely a "'tipster or introducer,'" the State does not have to reveal the CI's identity. Id. (quoting United States v. Sharp, 778 F.2d 1182, 1186 n.2 (6th Cir. 1985)). Likewise, the State does not have to reveal the CI's identity if the CI only provided information used to obtain a search warrant. Id. If the defendant establishes, though, that the CI is material to the defense, the State is required to divulge the CI's identity. Id. (citing State v. Vanderford, 980 S.W.2d 390, 397 (Tenn. Crim. App. 1987)). A trial court's decision as to whether to order the disclosure of a CI's identity is reviewed for an abuse of discretion. Id. at 526.

Here, the prosecution did not rely on any information provided by the CIs to prove the State's case against the Appellant. Instead, the State's proof mostly consisted of testimony by the Appellant's accomplices about their obtaining heroin and cocaine from the Appellant, their selling the drugs for him, the Appellant's trip to Michigan to obtain heroin, and the cocaine that the police found in the backpack on November 22. None of the CIs were witnesses to or participants in any of those events. The Appellant was not charged with any crime involving the CIs, and he has not offered any explanation as to how the CIs could have been material witnesses to his defense at trial. As to the Appellant's claim that the State was required to disclose CI-4's identity because CI-4 gave law enforcement exculpatory information, the affidavit in support of the wiretap provided that in August 2014, CI-4 "was instructed to enter the Church Street New and Used Tires on two occasions and to attempt to initiate conversation about narcotics. On neither instance, was [CI-4] able to engage any of the individuals in conversation concerning narcotics." However, nothing indicates that CI-4 spoke with the Appellant or that the Appellant was even present at the tire shop on those two occasions. Therefore, CI-4's information was not exculpatory. Accordingly, we conclude that the trial court did not abuse its discretion by denying the Appellant's motion to compel the State to reveal the identities of the CIs.

D. Prior Bad Act

The Appellant claims that the trial court erred by admitting a witness's testimony about a prior bad act and by not declaring a mistrial following the testimony. The State claims that the trial court did not err and correctly denied the Appellant's motion for a mistrial. We conclude that the trial court erred but that the error was harmless and that the trial court properly denied the Appellant's request for a mistrial.

During Latrisha Chapman's testimony, the State questioned her about a pretrial affidavit she signed and asked if she ever tried to convince the Appellant to stop selling drugs. Chapman answered, "Oh, yeah. This is not my first rodeo with Eric." Defense counsel objected, asked to approach the bench, and stated that "we are getting danger[ously] close to some bad character evidence." The trial court warned the State not to "get into" any prior bad acts, and the State agreed. Later during Chapman's testimony, she stated that the Appellant was not making a lot of money at his tire shop and that she eventually "realized what was going on." The State asked her, "And what was that?" Chapman answered, "Eric was back selling drugs." Defense counsel objected, asked to approach the bench, and moved for a mistrial because Chapman's testimony was evidence of a prior bad act. The State requested to "get this situation fixed," and the trial court responded, "I'll give you a shot." The trial court denied the motion for a mistrial, and the following exchange occurred:

> Q. By [the State]: Let's try it this way, Ms. Chapman, okay. Do you have your affidavit there in front of you?
>
> A. Yes.
>
> Q. Okay. Paragraph 12?
>
> A. Yes.
>
> Q. Do you see on this last page above your signature?
>
> A. Yes.
>
> Q. Okay. It says, Chapman was aware that Patton has made essentially no money at his tire shop. And she believed that Patton was making money dealing drugs.
>
> A. Yes.
>
> Q. Was that true then?

A. Yes. It's still true. I'm not saying that he wasn't dealing drugs. I'm saying I didn't know that he was doing it out of his shop.

Q. Okay. But that's what you figured out later?

A. Yes.

The Appellant claims that the trial court erred by not granting a mistrial because Chapman's testimony implied that the Appellant had a history of selling drugs. The Appellant also claims that because the trial court did not conduct a jury-out hearing pursuant to Tennessee Rule of Evidence 404(b), we should review this issue de novo. The State argues the Appellant has waived this issue for failing to provide any legal authority or argument in his brief and that, waiver notwithstanding, Chapman's testimony was not evidence of a prior bad act "but an isolated and spontaneous statement about the defendant's source of income." The State also argues that Chapman's comment "was not a prior bad act suggesting a history of drug dealing but an attempt to answer the State's question about the defendant's tire shop and its use as a place to maintain the drug enterprise."

Generally, a party may not introduce evidence of an individual's character or a particular character trait in order to prove that the individual acted in conformity with that character or trait at a certain time. Tenn. R. Evid. 404(a). Similarly, evidence "of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). Such evidence may be admitted for other purposes, though, if relevant to some matter actually at issue in the case and if its probative value is not outweighed by the danger of its prejudicial effect. Tenn. R. Evid. 404(b); State v. Wyrick, 62 S.W.3d 751, 771 (Tenn. Crim. App. 2001). Issues to which such evidence may be relevant include identity, motive, common scheme or plan, intent, or the rebuttal of accident or mistake defenses. Tenn. R. Evid. 404(b), Advisory Comm'n Cmts. Before the trial court may permit evidence of a prior crime, wrong, or act, the following procedures must be met:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling and the reasons for admitting the evidence;

- 40 -

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).  Provided that the trial court has complied with these procedures, this court will not overturn the trial court's decision to admit or exclude evidence under Rule 404(b) absent an abuse of discretion.  State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

A mistrial should be declared in criminal cases only in the event that a manifest necessity requires such action.  State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991).  In other words, a mistrial is an appropriate remedy when a trial cannot continue or a miscarriage of justice would result if it did.  State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994).  The decision to grant a mistrial lies within the sound discretion of the trial court, and this court will not interfere with the exercise of that discretion absent clear abuse appearing on the face of the record.  See State v. Hall, 976 S.W.2d 121, 147 (Tenn. 1998) (citing State v. Adkins, 786 S.W.2d 642, 644 (Tenn. 1990)).  Moreover, the burden of establishing the necessity for mistrial lies with the party seeking it.  State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

In determining whether a mistrial is necessary after a witness has testified about a defendant's prior bad act, this court has considered these non-exclusive factors:  "(1) whether the improper testimony resulted from questioning by the State, rather than having been a gratuitous declaration; (2) the relative strength or weakness of the State's proof; and (3) whether the trial court promptly gave a curative instruction."  State v. Bennie Nelson Thomas, Jr., No. W2004-00498-CCA-R3-CD, 2004 WL 2439405, at *5 (Tenn. Crim. App. at Jackson, Nov. 1, 2004) (quoting State v. Paul Hayes, No. W2001-02637-CCA-R3-CD, 2002 WL 31746693, at *4 (Tenn. Crim. App. at Jackson, Dec. 6, 2002)).

Turning to the instant case, the Appellant has provided very little legal authority or argument regarding Tennessee Rule of Evidence 404(b) or a mistrial.  Accordingly, he has risked waiving this issue.  See Tenn. Ct. Crim. App. R. 10(b).  Moreover, the Appellant cannot complain about the trial court's failure to hold a jury-out hearing pursuant to Tennessee Rule of Evidence 404(b) because he did not request such a hearing.  See Tenn. R. App. P. 36(a).

That said, Chapman's comment was improper because the jury could have construed it as a prior bad act by the Appellant.  Therefore, the trial court should have instructed the jury to disregard it.  However, nothing indicates that the State was aware that

Chapman was going to say the Appellant was "back" to selling drugs. Additionally, her statement was brief, and the State's case against the Appellant was particularly strong. Thus, we conclude that the trial court's error was harmless and that the trial court did not abuse its discretion by denying the Appellant's request for a mistrial. See Tenn. R. App. P. 36(b).

### E. Jury Instruction

The Appellant claims that the trial court gave an erroneous jury instruction regarding the credibility of the State's witnesses. The State argues that the trial court did not err. We agree with the State.

During the final jury charge, the trial court instructed the jurors as follows:

> You are exclusive judges of the credibility of the witnesses and the weight to be given to their testimony. If there are conflicts in the testimony of different witnesses, you must reconcile them if you can without hastily or rashly concluding that any witness has sworn falsely. For the law presumes that all witnesses are truthful.

> In forming your opinion as to the credibility of a witness, you may look to the proof, if any, of his or her general character, the evidence, if any, of the witnesses' reputation for truth and veracity, the intelligence and respectability of the witness, his or her interest or lack of interest in the outcome of the trial, his or her feelings, his or her apparent fairness or bias, his or her means of knowledge, the reasonableness of his or her statement, his or her appearance and demeanor while testifying, his or her contradictory statement as to material matters, if any are shown, and all of the evidence in the case tending to corroborate or contradict him or her.

The Appellant takes issue with the first paragraph of the instruction, asserting that the trial court misstated the law by telling the jurors that the State's witnesses were presumed truthful.[6]

---

[6] As noted by the Appellant and the State, the Appellant did not object to the jury instructions at trial but raised this issue in his motion for new trial. Therefore, because the issue involves an erroneous or inaccurate jury charge, as opposed to an incomplete jury charge, he has preserved the issue. State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005); see Tenn. R. Crim. P. 30(b) (providing that counsel's failure to object to a jury instruction "does not prejudice the right of a party to assign the basis of the objection as error in a motion for a new trial").

"It is well-settled that a defendant has a constitutional right to a complete and correct charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." Dorantes, 331 S.W.3d at 390. This court "must review the entire [jury] charge and only invalidate it if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law." State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995). A charge resulting in prejudicial error is one that fails to submit the legal issues to the jury fairly or misleads the jury about the applicable law. State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997). "Whether jury instructions are sufficient is a question of law appellate courts review de novo with no presumption of correctness." State v. Clark, 452 S.W.3d 268, 295 (Tenn. 2014).

The instruction about which the Appellant complains is a pattern jury instruction. See T.P.I.-Crim. 42.04. However, pattern jury instructions are suggestions, not controlling authority. State v. Hodges, 944 S.W.2d 346, 354 (Tenn. 1997).

In Cupp v. Naughten, 414 U.S. 141, 149 (1973), the United States Supreme Court held that an instruction regarding the presumption of truthfulness does not violate the Due Process Clause of the Fourteenth Amendment when the jury was "specifically instructed to consider the manner of the witness, the nature of the testimony, and any other matter relating to the witness' possible motivation to speak falsely" and when the jury was "charged fully and explicitly about the presumption of innocence and the State's duty to prove guilt beyond a reasonable doubt." Relying on Cupp, this court has held that a presumption-of-truthfulness instruction is not unconstitutional. Lundy v. State, 752 S.W.2d 98, 103 (Tenn. Crim. App. 1987); State v. Glebock, 616 S.W.2d 897, 906 (Tenn. Crim. App. 1981).

Despite those cases, the Appellant claims that in State v. Morgan Nyle Janyja, No. M2017-01835-CCA-R3-CD, 2018 WL 2304279 (Tenn. Crim. App. at Nashville, May 21, 2018), this court "rejected any notion that witnesses are presumed truthful, instead holding that the trier of fact must simply decide whether to believe each witness." The State asserts that the Appellant's reliance on Morgan Nyle Janyja is "wholly misplaced and irrelevant to this issue." We agree with the State. Morgan Nyle Janyja was a probation revocation case in which the defendant, relying on Lundy and Glebock, contended that the testimony of the defendant and his witness was presumed truthful. No. M2017-01835-CCA-R3-CD, 2018 WL 2304279, at *3. However, as this court stated in Morgan Nyle Janyja, the defendant's contention was irrelevant because credibility determinations in probation revocation cases were made by the trial court, not the jury. Id.

The Appellant also claims that in cases such as this one, involving accusations by "compensated co-defendants," our supreme court has held that due process requires "a more cautious" jury instruction. Specifically, in State v. Bolden, 979 S.W.2d 587, 590

- 43 -

(Tenn. 1998), our supreme court determined that the following "safeguards" must be followed prior to admitting testimony obtained through a plea agreement:

> (1) full disclosure of the terms of the agreements struck with the witnesses; (2) the opportunity for full cross-examination of those witnesses concerning the agreements and the effect of those agreements on the testimony of the witnesses; and (3) instructions cautioning the jury to carefully evaluate the weight and credibility of the testimony of such witnesses who have been induced by agreements with the State to testify against the defendant.

The Appellant alleges that the cautionary instruction in the instant case did not satisfy the third safeguard because the instruction ordered the jurors to believe the State's witnesses. The Appellant claims that in assessing the prejudicial nature of the error, this court also should consider that the codefendants were required to sign "written scripts" in the form of written affidavits as part of their plea agreements, noting that Vickie Brown's "script" was introduced into evidence even though she testified that it was not true, and that the entire plea agreement of each witness was not introduced into the record.

In Bolden, the defendant and his codefendant were charged with first premeditated degree murder. 979 S.W.2d at 589. The codefendant entered into an agreement with the State in which he agreed to testify truthfully against the defendant in exchange for a plea to second degree murder and a twenty-five-year sentence. Id. However, at trial, the codefendant claimed that he did not remember what happened on the night of the murder. Id. During a recess, the State entered into a second agreement with the codefendant in which he agreed to testify against the defendant in exchange for a plea to second degree murder and a fifteen- to twenty-five-year sentence. Id. The defendant, whom the jury convicted of second degree murder, argued on direct appeal of his conviction that he was denied his right to due process and a fair trial because the agreement required that the codefendant testify to specific acts. Id. at 590. Our supreme court disagreed, holding that nothing indicated the codefendant was required to give false testimony or testify according to a particular script. Id. at 592. The supreme court also noted that the "essential safeguards" were followed in that the jury and the defendant were informed of the agreement, the defendant conducted a full and vigorous cross-examination of the codefendant, and "the jury was instructed that its function was to weigh the testimony and determine the credibility of the witness." Id. at 592-93.

Here, the trial court instructed the jury that "[y]ou are the exclusive judges of the credibility of the witnesses and the weight to be given to their testimony." See id. at 591. Furthermore, the trial court instructed the jury to reconcile conflicts in the testimony of the witnesses "if you can without hastily or rashly concluding that any witness has sworn falsely." The trial court did not instruct the jurors to believe the State's witnesses and even

listed numerous factors for the jury to consider in determining the credibility of a witness, including the witness's "apparent fairness or bias." Finally, the trial court specifically instructed the jury that Latrisha Chapman, Wayne LeBlanc, Christina LeBlanc, Kimberly Jordan, Lakeisha Smith, Crystal Hill, and Vickie Brown were accomplices and that the jurors had to find that their testimony had been sufficient corroborated in order to convict the Appellant. Therefore, we conclude that the trial court did not err by instructing the jury that the State's witnesses were presumed truthful and that the jury instructions did not violate the third safeguard in Bolden.

As to the Appellant's claim that the codefendants testified according to written scripts, the jury was advised that the codefendants had given sworn statements as part of their plea agreements, and nothing indicates that their testimony was scripted by those statements. In fact, Brown's testimony was inconsistent with her sworn statement, which was the basis for the State's being allowed to introduce the prior statement into evidence. There also is no indication that any of the plea agreements required false or perjured testimony. See id. at 592. The State divulged the terms of each codefendant's plea agreement to the jury, and the Appellant vigorously questioned the codefendants about the terms of their plea agreements. Therefore, we conclude that the Appellant is not entitled to relief.

## F. Suppression of Exculpatory Evidence

The Appellant claims that the State suppressed exculpatory evidence of a "corrupt cop," who was one of the lead investigators in this case. The State argues that the Appellant has failed to show that the State suppressed exculpatory evidence. We agree with the State.

On cross-examination by defense counsel, Agent Noel and Lieutenant Goney acknowledged that Lieutenant Jason Mathis, a former police officer who had worked on the Appellant's case, was being criminally investigated by the TBI. At the hearing on the Appellant's motion for new trial, defense counsel introduced documents into evidence, showing that on November 6, 2018, which was the second day of the Appellant's five-day trial, the Rutherford County Grand Jury indicted Mathis for theft of property valued $2,500 or more but less than $10,000 and official misconduct. On August 16, 2019, Mathis pled guilty to the theft charge, a Class D felony. The trial court granted judicial diversion and placed him on unsupervised probation for two years. Defense counsel advised the trial court at the hearing on the motion for new trial that he did not know "exactly" the facts related to Mathis's conviction but that "[m]y understanding is he stole a vehicle or something that had been forfeited in the drug war." Defense counsel then asserted that the State knew about Mathis's pending indictment at the time of the Appellant's trial, that the Appellant had wanted to argue at trial that he was being "framed," and that the State's withholding information about Mathis's criminal charges was a Brady violation.

- 45 -

In Brady v. Maryland, 373 U.S. 83, 87 (1963), the United States Supreme Court held that the State has a constitutional duty to furnish the defendant with exculpatory evidence pertaining to the defendant's guilt or innocence or to the potential punishment faced by the defendant. Specifically, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. The State's duty to disclose exculpatory evidence extends to evidence which may be used by the accused for impeachment purposes. Giglio v. United States, 405 U.S. 150, 154-55 (1972).

In order to prove that a violation exists, a defendant must show that (1) he requested the information (unless the evidence is obviously exculpatory, in which case the State is obligated to release such evidence regardless of whether or not it was requested); (2) the State suppressed the information; (3) the information was favorable to the defendant; and (4) the information was material. State v. Edgin, 902 S.W.2d 387, 390 (Tenn. 1995). Evidence is favorable if it "'provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness.'" Johnson v. State, 38 S.W.3d 52, 56-57 (Tenn. 2001) (quoting Commonwealth v. Ellison, 379 N.E.2d 560, 571 (Mass. 1978)). The State's duty to disclose extends to all favorable evidence regardless of whether the evidence is admissible at trial. Brady, 373 U.S. at 87. Brady applies to both evidence in the prosecution's file and "any favorable evidence known to the others acting on the government's behalf in the case, including the police." State v. Jackson, 444 S.W.3d 554, 594 (Tenn. 2014) (internal citations and quotation marks omitted). The State's duty to disclose does not extend to information the defendant already possesses or is able to obtain or to information not in the possession of the prosecution or another governmental agency. State v. Marshall, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992).

Generally, "[e]vidence is deemed to be material when 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Johnson, 38 S.W.3d at 58 (quoting Edgin, 902 S.W.2d at 390). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles v. Whitley, 514 U.S. 419, 434 (1995). Accordingly, a "reasonable probability" of a different result is established when "the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" Id. (quoting Bagley, 473 U.S. at 678). Materiality requires a "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Id. at 435. In determining

whether the evidence is material, the suppressed evidence must be "considered collectively, not item by item." Id. at 436. The appellant bears the burden of proving a Brady violation by a preponderance of the evidence. Edgin, 902 S.W.2d at 390.

The State contends that the Appellant is not entitled to relief because he has failed to show that the information about Lieutenant Mathis was "obviously exculpatory," that the State suppressed the information, and that the information was favorable and material. We agree with the State. Lieutenant Mathis was just one of five officers who participated in the execution of the search warrant at the apartment of Juan Kuilan and Kimberly Jordan. Although Lieutenant Mathis found incriminating evidence related to the heroin conspiracy during the search, he did not participate in any of the other searches, including the search of Brown's apartment in which heroin was discovered in the Appellant's jacket pocket and a large amount of cash was found on the Appellant's person. Defense counsel did not call Lieutenant Mathis to testify at the hearing on the motion for new trial, so we do not know the underlying facts that resulted in his charges and conviction. However, even if he were under criminal investigation and ultimately convicted of theft for stealing a car forfeited in another drug case, we do not think those facts exculpated the Appellant from the instant offenses. Moreover, Lieutenant Mathis did not testify at the Appellant's trial; therefore, the information at issue could not be used to impeach him.

Agent Noel and Lieutenant Goney acknowledged on cross-examination by the Appellant that Lieutenant Mathis was being criminally investigated by the TBI. Seven accomplices testified as to the Appellant's involvement and leadership in the conspiracy. As stated previously, the State's proof against the Appellant was particularly strong, and we do not think the undisclosed information would have put the whole case in such a different light as to undermine confidence in the verdict. Accordingly, we conclude that the Appellant is not entitled to relief under Brady.

G. Cumulative Error

The Appellant contends that he is entitled to relief under cumulative error. However, we find no merit to this claim.

### III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we find no reversible error and affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE

- 47 -